# United States Court of Appeals
# for the Federal Circuit

---

**STOCKTON EAST WATER DISTRICT,**
*Plaintiff,*

AND

**CENTRAL SAN JOAQUIN WATER
CONSERVATION DISTRICT,**
*Plaintiff-Appellant,*

AND

**SAN JOAQUIN COUNTY, STOCKTON CITY,** AND
**CALIFORNIA WATER SERVICE COMPANY,**
*Plaintiffs,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2013-5078

---

Appeal from the United States Court of Federal Claims in No. 04-CV-0541, Judge Christine O.C. Miller.

---

Decided: August 1, 2014

---

ROGER J. MARZULLA, Marzulla Law, LLC, of Washington, DC, argued for plaintiff-appellant. With him on the brief was NANCIE G. MARZULLA.

DAVID A. HARRINGTON, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were STUART F. DELERY, Assistant Attorney General, BRYANT G. SNEE, Acting Director, and BARBARA E. THOMAS, Trial Attorney.

———————————

Before NEWMAN, PLAGER, and TARANTO, *Circuit Judges.*

PLAGER, *Circuit Judge.*

This is a breach of contract case against the United States, on appeal again from the United States Court of Federal Claims ("trial court"). Appellant Central San Joaquin Water Conservation District ("Central") seeks modification of the trial court's damages award, made by the trial court following our earlier remand. *Stockton E. Water Dist. v. United States*, 583 F.3d 1344 (Fed. Cir. 2009), *reh'g en banc granted in part, aff'd*, 638 F.3d 781.

In 1983, Central entered into a contract with the United States Bureau of Reclamation ("Reclamation") for an appropriation of water from the New Melones Reservoir within California's San Joaquin Valley.[1] Upon

_____

[1] Stockton East Water District ("Stockton East") also entered into a contract with Reclamation for an appropriation of water from the New Melones Reservoir in 1983. *Stockton E. Water Dist. v. United States*, 109 Fed. Cl. 460, 464 (2013). Stockton East's damages trial proceeded separately and the trial court issued a separate

enactment of the Central Valley Project Improvement Act ("CVPIA") in 1992, Reclamation made statements indicating that it would not be able to meet the quantity commitments in its contracts because of other demands for the water. In 1993, Central sued the United States ("Government") for breach of contract in federal district court, marking the beginning of a lengthy litigation that remains unresolved.

Subsequently, the case was transferred to the Court of Federal Claims for trial. As indicated, we earlier heard the breach of contract claims on appeal from the trial court and, determining contrary to the trial court's view that breaches had occurred in certain years, we reversed and remanded the proceedings to the trial court for a determination of damages.[2] The trial court on remand awarded Central $149,950.00 in cost of cover damages, but denied any expectancy damages. Central timely appeals the denial of expectancy damages.

We conclude that the trial court erred by not properly considering the effect of Reclamation's announced breaches on the amount of water that Central may have expected to need to meet demand. This caused the trial court to discount Central's arguments regarding what would have happened in the non-breach world. Accordingly, we affirm the trial court's judgment granting cost of cover damages but vacate the trial court's judgment denying expectancy damages, and remand for further proceedings consistent with this opinion.

---

opinion regarding Stockton East's contract damages, which are not at issue in this appeal. *Id.* at 465.

[2] *Stockton E. Water Dist.*, 583 F.3d 1344. The takings issue, which was included in the remand, is not now before us.

A.  BACKGROUND

In 1983 Central, along with Stockton East, entered in-to contracts with Reclamation for an appropriation of water from the New Melones Reservoir within California's San Joaquin Valley.  The Central contract was intended, following a ten-year buildup period, to make available to Central a maximum of 80,000 acre-feet and a minimum of 56,000 acre-feet of surface water per year from the New Melones Unit of the Central Valley Project ("CVP").  Joint Appendix ("JA") 166-91.  The water was to be used to support agricultural enterprise in the San Joaquin Valley.  Under the contract, Central would submit a schedule each year indicating the amounts of water required monthly, with the first schedule to be submitted two months prior to the initial delivery of water.  JA 176 (Article 4(a)).

As part of its preparations for accepting water from the New Melones Unit, Central sought to determine the type and location of distribution facilities it had to con-struct by ascertaining the amounts of water the area's agricultural activities would use in the years ahead.  Central retained international engineering firm CH2M Hill to assist in this determination.  CH2M Hill held several meetings with the farmers, surveyed their lands, and obtained letters of intent signed by farmers.

CH2M Hill concluded that Central would use at least 50,000 acre-feet of New Melones water per year, which, because of the thirty percent conveyance loss during transit from the New Melones Dam, required over 70,000 acre-feet per year from the reservoir.  JA 1300, 1311.  Based on CH2M Hill's analysis, Central's board author-ized the execution of bonds to build the needed infrastruc-ture, at a cost of $7.4 million.  JA 1312.

In May 1988, Reclamation announced the initial de-livery of water.  During the period from 1988–1992, however, no water was delivered to Stockton East and Central (the "Districts") because construction of the water

conveyance systems was not yet completed. *Stockton E. Water Dist.*, 109 Fed. Cl. at 472. Then, in 1992, Congress enacted the CVPIA, which imposed on Reclamation a new requirement to dedicate annually 800,000 acre-feet of water from the CVP for fish, wildlife, and habitat restoration needs. *Id.* at 472 n.11. In the spring of 1993, in a meeting with the Districts, Reclamation made it clear that "this prescription [under the CVPIA] would continue and in only the wettest years might [the Districts] see some water." *Id.* at 472.

Following this announcement, Central sued for injunctive and declaratory relief and damages in the U.S. District Court for the Eastern District of California. *See Stockton E. Water Dist. v. United States*, 101 Fed. Cl. 352, 354 (2011). The case eventually was transferred to the Court of Federal Claims and a trial on liability was held in 2006. *See Stockton E. Water Dist. v. United States*, 75 Fed. Cl. 321, 376 (2007).

1.

Beginning in 1993, the amount of water made available to Central (and to Stockton East) by Reclamation varied significantly. Although in our earlier decision on appeal we specifically determined that breaches of the contract occurred in the years 1999 through 2004, a summary of what occurred prior to those years is helpful to understand the actions of the parties in the relevant time frame.

### *1993*

In 1993, the Districts requested a total of 20,000 acre-feet, with 10,000 allocated to each district. *Stockton E. Water Dist.*, 109 Fed. Cl. at 472. Reclamation delivered no water under the contracts in 1993. *Id.* at 473.

### 1994

In 1994, Central requested 25,000 acre-feet of water. In the meantime, Reclamation announced that it was forecasting a critically dry year for 1994, with an initial forecast providing a "zero water supply" for the Districts. *See id.* Ultimately, neither Stockton East nor Central received any water from New Melones in 1994, with Reclamation invoking the shortage provision of Article 9 of the 1983 contracts.[3] *Id.*

### 1995

Central initially requested 50,000 acre-feet of water in 1995. *Id.* at 473. In February of 1995, Reclamation announced that, due to general drought and water level conditions in the New Melones Reservoir, only a total of 37,000 acre-feet would be made available to the Districts. *Id.* After a delay in water delivery, the Districts submitted reduced requests in August 1995, at which time Central revised its delivery request to 5,000 acre-feet. *Id.* Reclamation delivered only 4,564 acre-feet to Central in 1995. *Id.*

### 1996

In 1996 Central requested 40,000 acre-feet. *Id.* Reclamation announced an allocation of 49,000 acre-feet to the Districts for 1996 and made available all of the water Stockton East initially requested for that year (32,400 acre-feet), *id.*, though Stockton East ultimately submitted

---

[3]    The shortage provision of Article 9(a) provides that the United States shall not be liable "if a shortage does occur in any year because of drought, or other causes which . . . are beyond the control of the United States." JA 183.

a revised, lowered request. Reclamation delivered 17,508 acre-feet to Central in 1996. *Id.*

### 1997–98

Reclamation, along with the United States Fish and Wildlife Service, the Districts, and other interested parties, undertook negotiation of an Interim Plan of Operations ("IPO"), which was completed and agreed to in 1997. *Id.* at 473. The Districts agreed to the terms of the IPO as a short-term modification to the 1983 contracts for 1997 and 1998. *Id.* The IPO provided a computational mechanism for allocating water to the Districts based on annual storage and inflow forecasts at the New Melones Reservoir. *Stockton E. Water Dist.*, 583 F.3d at 1353. Under the IPO, the Districts were allocated a combined total of 50,000 acre-feet for each of the relevant years, and Reclamation's water deliveries complied with the terms of the IPO. *Stockton E. Water Dist.*, 109 Fed. Cl. at 473.

### 1999–2004

Even though the IPO was only adopted for use in 1997 and 1998, Reclamation continued to use the formulas set out in the IPO to allocate water to the Districts from 1999 through 2004. *Id.* at 473-74. The following table, adapted from our 2009 opinion on breach of contract, summarizes (in acre-feet) the water requested by the Districts, the allocations made by Reclamation using the IPO, and the water actually delivered to each district between 1999 and 2004 ("Table A"):

| Year | Requested by Stockton East | Requested by Central | Quantity of Water Allocated | Delivered to Stockton East | Delivered to Central |
|------|------|------|------|------|------|
| **1999** | 23,000 | None | 60,000 | 31,112 | 33,786 |

| 2000 | 24,000 | None | 90,000 | 7,377 | 27,759 |
|------|--------|------|--------|-------|--------|
| 2001 | 24,000 | None | 34,000 | 7,030 | 25,747 |
| 2002 | 3,500 | 12,000 | 15,500 | 3,493 | 10,508 |
| 2003 | 10,000 (combined with Central) | 10,000 (combined with Stockton East) | 10,000 | 2,210 | 9,846 |
| 2004 | None | 25,000 | 15,000 | 1,486 | 13,605 |

*See Stockton E. Water Dist.*, 583 F.3d at 1353.

In each of these years, the terms of the contract called for a minimum allocation of 56,000 acre-feet of water to Central alone. *Id.* at 1352. After it was clear Reclamation would not meet these allocations, Central purchased water from the South San Joaquin Irrigation District ("SSJID"), in order to make up for the shortage of water from Reclamation in the years 2002 through 2004. *See* JA 211; *Stockton E. Water Dist.*, 109 Fed. Cl. at 475.

2.

The trial court initially awarded judgment for the Government on the breach of contract claims for 1993 through 2004 and dismissed a related takings claim. *Id.* at 476. The trial court subsequently granted in part and denied in part the Districts' motion to alter or amend the judgment and denied the Districts' motion for reconsideration, prompting the Districts to appeal to this court challenging the trial court's non-liability judgment for 1994, 1995, and 1999–2004. *Id.*

On appeal, we affirmed the trial court's judgment of non-liability as to the Districts' breach of contract claims for 1994 and 1995, reversed the trial court's judgment of

non-liability with regard to the Districts' breach of contract claims for 1999 through 2004, and vacated the trial court's dismissal of the Districts' takings claim. *Stockton E. Water Dist.*, 583 F.3d at 1369. We then remanded the case to the trial court to decide the Districts' takings claim[4] and determine damages for the breaches that occurred from 1999 through 2004.[5]

On remand the trial court found that Central was entitled to cost of cover damages in the amount of $149,950.00, the difference between the total amount Central paid to SSJID for water and the total amount Central would have paid to Reclamation for the water in 2002–2004. *Stockton E. Water Dist.*, 109 Fed. Cl. at 483. The trial court denied Central any expectancy damages, finding that Central did not set forth persuasive evidence demonstrating how much New Melones water its farmers plausibly might have requested in the 1999–2004 non-breach world, one in which Reclamation made full allocations under the 1983 contract, and did not present any credible evidence that it would have made sales of surplus water if the contractual minimums had been made available to it. *Id.* at 492–93.

## B.  DISCUSSION

### 1.  Standard of Review

We review the judgments of the Court of Federal Claims "to determine if they are incorrect as a matter of law or premised on clearly erroneous factual determina-

---

[4]   In October 2011, following briefing by the parties, the trial court granted Appellee's motion to dismiss Appellants' takings claim. *Stockton E. Water Dist.*, 101 Fed. Cl. at 362.

[5]   Further details of the prior proceedings can be found in *Stockton E. Water Dist.*, 109 Fed. Cl. 460.

tions"; we review that court's legal determinations without deference. Dairyland Power Co-op v. United States, 645 F.3d 1363, 1368–69 (Fed. Cir. 2011) (internal citations omitted). We review the factual findings of the Court of Federal Claims for clear error, Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed.Cir.2005), including "the general types of damages awarded . . . , their appropriateness . . . , and rates used to calculate them . . . ," Home Savings of America v. United States, 399 F.3d 1341, 1347 (Fed.Cir.2005). This court provides the trial court with wide discretion in determining an appropriate quantum of damages. Hi–Shear Tech. Corp. v. United States, 356 F.3d 1372, 1382 (Fed.Cir.2004). Interpretation of contracts is a question of law that we review without deference. Sevenson Envtl. Servs., Inc. v. Shaw Envtl., Inc., 477 F.3d 1361, 1364–65 (Fed. Cir. 2007).

### 2. Analysis

#### i. *Breach of Contract*

It is clear from the briefs of the parties that there is still a misunderstanding as to precisely what Reclamation's breach of contract entailed, a misunderstanding that may have affected the trial court's view of the matter. We first turn to this issue because the nature of Reclamation's breach informs the damages analysis.

The portion of the contract at issue is Article 3(c), which states:

> The United States shall make available to the Contractor the annual quantities of agricultural water, up to a maximum quantity of 80,000 acre-feet, as specified in the schedule submitted by the Contractor in accordance with Article 4 and the Contractor shall pay for said water in accordance with Article 5: Provided, That the United States shall make available and the contractor shall pay

for, as a minimum, such quantities of agricultural water specified below:

***

[F]or years nine and 10 the minimum quantity of 56,000 acre-feet . . . . Each year beginning in the eleventh year and continuing for the remaining contract term the quantity of water schedule in the eleventh year, which quantity shall be at least equal to or greater than the quantity made available and paid for in the tenth year . . . .

JA 173–74.

Central argues that the trial court misinterpreted Article 3(c), reducing its maximum annual delivery requirement from 80,000 acre-feet to 56,000 acre-feet and eliminating the minimum delivery requirement altogether. Central argues that Reclamation was obligated to provide, and Central was obligated to pay, for at least 56,000 acre-feet of water per year regardless of whether Central actually requested that quantity or not. Central also argues that the trial court improperly read the take-or-pay requirement entirely out of the contract on the ground that the Government would not have enforced it anyway.

Central further argues that the government and engineering studies, and specifically the CH2M Hill study commissioned in the early 1990s prior to the filing of this lawsuit, are relevant to determining expectancy damages. Central argues that the trial court erred in ignoring this information, and placing on Central the burden of proving how much water Central's farmers would have requested.

Central relies on our decision in the breach of contract appeal to support its position that the breach of contract was Reclamation's failure to deliver to Central the contract minimum of 56,000 acre-feet of water in each of the six relevant years, as required by Article 3(c):

> There is no denying that the quantities of water promised were not delivered, and that therefore a breach occurred. This is beyond dispute—the evidence is conclusive; the trial court so held; and this court affirmed that finding.

*Stockton E. Water Dist.*, 638 F.3d at 783 (citing *Stockton E. Water Dist.*, 583 F.3d at 1370).

The Government argues that the trial court properly construed Article 3 of the contract and that Central failed to cite to any contract provision suggesting that the contract required Reclamation to "deliver" water irrespective of Central's wishes or without a written request that water be delivered. Further, the Government argues that it is insufficient for Central to point out that the contract required Reclamation to make more water available during the breach years; Central must also present record evidence establishing what would have happened if Reclamation had made available the requisite water. The Government argues that Central confuses the actual world in which its obligation to submit a water delivery schedule was excused by Reclamation's breach, and the hypothetical no-breach world in which Central would have requested and received water in accordance with the schedule it had tendered.

Although we previously addressed the issue of breach in our 2009 opinion, the opinion dealt largely with defenses to breach of contract rather than extensive discussion regarding the nature of the breach. *See generally Stockton E. Water Dist.*, 583 F.3d 1344 (2009). However, in the opinion, we made clear that "the Districts and Reclamation have binding contracts for specified quantities of water which Reclamation is obligated to provide," and that "Reclamation failed to provide those specified quantities in the years at issue." *Id.* at 1369.

Even so, Central mischaracterizes some of the statements from our 2009 opinion to support its theory that

Reclamation's breach was in its failure to *deliver* the minimum quantity of water in each of the breach years, rather than its failure to *make available* the minimum quantity of water. The contract explicitly says that the burden is to make the water available, not to deliver it:

> "The United States shall **make available** to the Contractor" . . . "which quantity shall be at least equal to or greater than the quantity **made available** and paid for in the tenth year"

JA 173–74 (emphasis added).

Based on the plain language of the contract, discussing Reclamation's obligation to "make available" certain quantities of water, we agree with the way in which the trial court defined the breach in this case, including its finding that the "take or pay" provision would not have been enforced absent Reclamation's breach. *See Stockton E. Water Dist.*, 109 Fed. Cl. at 487. The trial court's error was not in its interpretation of the breach of contract, rather, the trial court's error lies in its analysis of how expectancy damages are to be analyzed based on the facts of this case.

### ii. Expectancy Damages

A crucial event in this case occurred in 1993 when Reclamation announced that it would not be able to meet the minimum allocations provided for in the contract. This event triggered the Districts to file suit for breach of contract, the long path to trial resulting in evidence of breaches of contract in the post-1993 years when Reclamation's non-performance was not excused. In the circumstances of this case, the question the trial court should have been examining in determining the "but for" non-breach world is: what would have happened had Reclamation not announced in 1993 (and later years) that it would be unable to meet—to "make available"—the minimum allocations provided for in the contract?

To answer this question, the trial court should have considered not just the conduct of the parties during the years for which liability has been found (1999–2004), but also the effect of the announcements in 1993 (and afterward) that, because of the 1992 legislation, Reclamation was not going to make available the minimum contractual allocations. Instead, the trial court improperly declined to consider this evidence and other evidence related to Reclamation's poor performance prior to 1999, focusing its damages analysis on Central's failure to request at least the minimum amount of water specified in the contract in the years following Reclamation's non-performance announcements. *Stockton E. Water Dist.*, 109 Fed. Cl. at 489-93. That was legal error, which impacted the characterization of the non-breach world.

The trial court misconstrued our earlier decision and the law of contracts. We did not hold that, just because liability for breach was found only for 1999–2004, the determination of the hypothetical non-breach world must disregard the effect of conduct occurring before 1999. To analyze expectancy damages one looks at what would have happened "had the contract been performed." Restatement (Second) of Contracts § 344(a); *Slattery v. United States*, 583 F.3d 800, 820 (Fed. Cir. 2009); *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001); *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001). In this case, that question requires determining the effect of the non-performance announcements starting in 1993.

As noted above, Reclamation stated in 1993 that there would be insufficient water available to meet the contract minimums. In each of the years leading up to 1999, Reclamation consistently announced that less than the minimum amount of water would be available, continuing to announce that less than the minimum amount of water would be available even when, in 1999–2004, it lacked any excuse. The "but for" world of performance in 1999–

2004 is a world without the uniform underlying reason for not making the minimum water quantities available, i.e., a world in which the non-performance announcements starting in 1993 did not occur.

The trial court's failure to examine what would have happened had there been no such announcements starting in 1993 had an important impact on its damages analysis. The trial court assumed, erroneously, and without considering the lingering impact of the pre-1999 announcements, that Central's failure to request the contractual minimum quantity of water every year was because there was insufficient demand for the water from Central's potential customers. Absent actual demand, the assumption was that no economic loss to Central could be attributed to Reclamation's failure to make available the contracted-for amounts of water.

In fact, it is eminently plausible that the Government's announced non-performance in 1993 and the years following caused any lack of expressed demand for water and for requests by Central for less than the contract minimum quantities in 1999–2004. By 1994, and certainly by 1999, Central and its farmer clients were on notice that Reclamation was not going to supply the contractual quantities of water, whether or not circumstances conspired to provide Reclamation legal excuses in certain years. At some point most people stop asking for what they have been told they are not going to get, and they make other plans to meet their needs.

In 1993, after the enactment of the 1992 legislation, Reclamation first announced that it was going to make sub-minimum allocations. That same year, the New Melones Conveyance System was completed. Instead of focusing on the impact of Reclamation's announcements and actions in all of the years prior to 1999 on Central and the farmers, the trial court concentrated much of its analysis on the simple fact that Central took less water

than it demanded or that Reclamation allocated to it in 1996, a year the trial court found would be indicative of the non-breach world. *Stockton E. Water Dist.*, 109 Fed. Cl. at 489–93.

In so doing, the trial court adopted a legally erroneous limitation on the required analysis. It should have considered the impact of the announced breaches on the requests from 1999–2004. The result would be that testimony and data from 1993 onward are relevant to the damages determination. Such testimony may be used to show that farmers might have been requesting substantial quantities of water, up to the maximums provided for in Central's contract with Reclamation, but for Reclamation's consistent announcements that less than the contractual minimum amounts of water would be made available to the Districts.

Why would Central request water it was told would not be available? It seems clear that having sufficient water available is paramount to the success of the agricultural enterprise, and failure to obtain the water needed from Central quite plausibly would have caused the farmers to look elsewhere, on their own, for water, or to resort to using ground water.

Because the trial court did not take into account the effect of Reclamation's announcements on the expectations of the district and the agricultural community it served, we vacate the judgment denying any expectancy damages and remand for a damages determination consistent with this opinion. We leave it to the trial court to determine if the record needs to be reopened to allow evidence relevant to the damages occurring as a result of the breaches as defined herein.

### iii. Cost of Cover Damages

In its Brief as Appellee, the Government argues that the trial court erred in awarding cost of cover damages

because Central's audited financial statements do not match the testimony regarding the amount paid to SSJID for Central's purchases of water. Further, the Government argues that Central should not receive compensation for water purchased from SSJID at a higher price than it could have been purchased from Reclamation when Central failed to take all of the water allocated and available from Reclamation during the breach period.

Central argues that the Government waived its right to challenge the trial court's award of cost of cover damages by failing to cross-appeal this issue. Central further argues that even if the Government had timely cross-appealed, the trial court's decision to award cost of cover damages was correct and should be affirmed because the trial court properly found Central's evidence regarding the amount paid to SSJID more reliable than the ambiguous financial reports upon which the Government sought to rely.

"It is well-settled that a party must file a cross-appeal if, although successful in the overall outcome in the district court, the party seeks, on appeal, to lessen the rights of its adversary or to enlarge its own rights." *Lazare Kaplan Int'l, Inc. v. Photoscribe Technologies, Inc.*, 714 F.3d 1289, 1293 (Fed. Cir. 2013) (citing *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999)). Because the Government failed to make a proper cross-appeal, it waived its right to make this argument on appeal and we need not reach this issue. Thus, we affirm the trial court's finding on cost of cover damages.

CONCLUSION

The judgment of the trial court is affirmed-in-part, vacated-in-part, and remanded for reconsideration of expectancy damages consistent with this opinion.

**AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED**

COSTS

Costs are awarded to Appellant.