# United States Court of Appeals for the Federal Circuit

---

**LONNY E. BALEY, ET AL., JOHN ANDERSON FARMS, INC., ET AL.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,**
*Defendants-Appellees*

---

2018-1323, 2018-1325

---

Appeals from the United States Court of Federal Claims in Nos. 1:01-cv-00591-MBH, 1:07-cv-00194-MBH, 1:07-cv-19401-MBH, 1:07-cv-19402-MBH, 1:07-cv-19403-MBH, 1:07-cv-19404-MBH, 1:07-cv-19405-MBH, 1:07-cv-19406-MBH, 1:07-cv-19407-MBH, 1:07-cv-19408-MBH, 1:07-cv-19409-MBH, 1:07-cv-19410-MBH, 1:07-cv-19411-MBH, 1:07-cv-19412-MBH, 1:07-cv-19413-MBH, 1:07-cv-19414-MBH, 1:07-cv-19415-MBH, 1:07-cv-19416-MBH, 1:07-cv-19417-MBH, 1:07-cv-19418-MBH, 1:07-cv-19419-MBH, 1:07-cv-19420-MBH, Senior Judge Marian Blank Horn.

---

Decided: November 14, 2019

---

ROGER J. MARZULLA, Marzulla Law, LLC, Washington, DC, argued for plaintiffs-appellants Lonny E. Baley, Mark

R. Trotman, Baley Trotman Farms, James L. Moore, Cheryl L. Moore, Daniel G. Chin, Deloris D. Chin, Wong Potatoes, Inc., Michael J. Byrne, Byrne Brothers, John Anderson Farms, Inc., Buckingham Family Trust, Eileen Buckingham, Keith Buckingham, Shelly Buckingham, Constance Frank, John Frank, Hill Land and Cattle Co., Inc., Jeff Hunter, Sandra Hunter, McVay Farms, Inc., Barbara McVay, Matthew K. McVay, Michael McVay, Ronald McVay, Suzan McVay, Tatiana V. McVay, Henry O'Keeffe, Patricia O'Keeffe, Shasta View Produce, Inc., Edwin Stastny, Jr., All Plaintiffs. Also represented by NANCIE GAIL MARZULLA. Plaintiffs-appellants John Anderson Farms, Inc., Buckingham Family Trust, Eileen Buckingham, Keith Buckingham, Shelly Buckingham, Constance Frank, John Frank, Hill Land and Cattle Co., Inc., Jeff Hunter, Sandra Hunter, McVay Farms, Inc., Barbara McVay, Matthew K. McVay, Michael McVay, Ronald McVay, Suzan McVay, Tatiana V. McVay, Henry O'Keeffe, Patricia O'Keeffe, Shasta View Produce, Inc., Edwin Stastny, Jr. also represented by ALAN IRVING SALTMAN, Smith, Currie & Hancock LLP, Washington, DC.

JOHN LUTHER SMELTZER, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by ELIZABETH ANN PETERSON, ERIC GRANT, JEFFREY H. WOOD.

TODD D. TRUE, Earthjustice, Seattle, WA, argued for defendant-appellee Pacific Coast Federation of Fishermen's Associations. Also represented by STEPHANIE KATHLEEN TSOSIE.

CHARLES T. DUMARS, Law & Resource Planning Associates, PC, Albuquerque, NM, argued for amicus curiae The Middle Rio Grande Conservancy District. Also represented by TANYA L. SCOTT; LORNA M. WIGGINS, Wiggins, Williams & Wiggins, PC, Albuquerque, NM.

CRAIG A. PARTON, Price, Postel & Parma LLP, Santa Barbara, CA, for amici curiae City of Fresno, Arvin-Edison Water Storage District, Chowchilla Water District, Delano-Earlimart Irrigation District, Exeter Irrigation District, Ivanhoe Irrigation District, Lindmore Irrigation District, Lindsay-Strathmore Irrigation District, Lower Tule River Irrigation District, Orange Cove Irrigation District, Porterville Irrigation District, Saucelito Irrigation District, Shafter-Wasco Irrigation District, Southern San Joaquin Municipal Utility District, Stone Corral Irrigation District, Terra Bella Irrigation District, Tulare Irrigation District, Kern Tulare Water District, Kaweah Delta Water Conservation District, Tea Pot Dome Water District, Fresno Irrigation District, Friant Water Authority.

DANIEL LUCAS, Office of the Attorney General, California Department of Justice, Los Angeles, CA, for amicus curiae California State Water Resources Control Board. Also represented by XAVIER BECERRA, ROBERT W. BYRNE, ERIC M. KATZ, MELINDA PILLING, San Francisco, CA; JOSHUA A. KLEIN, Oakland, CA.

JAMES HUFFMAN, Portland, OR, for amici curiae Family Farm Alliance, National Water Resources Association.

DAVID E. FILIPPI, Stoel Rives LLP, Portland, OR, for amicus curiae Oregon Water Resources Congress. Also represented by KIRK BENNY MAAG; STEVEN L. SHROPSHIRE, Jordan Ramis PC, Bend, OR.

DOUGLAS W. MACDOUGAL, Marten Law PLLC, Portland, OR, for amici curiae Oregon Farm Bureau Federation, California Farm Bureau Federation, Idaho Farm Bureau Federation, New Mexico Farm and Livestock Bureau, Colorado Farm Bureau, Nevada Farm Bureau, Utah Farm Bureau Federation, Wyoming Farm Bureau Federation. Also represented by SARAH ELIZABETH PETERSON,

Coblentz Patch Duffy & Bass LLP, San Francisco, CA.

DAVID R.E. ALADJEM, Downey Brand LLP, Sacramento, CA, for amicus curiae Association of California Water Agencies. Also represented by SAMUEL BIVINS, AVALON J. FITZGERALD, MEREDITH E. NIKKEL.

DENISE FJORDBECK, Oregon Department of Justice, Salem, OR, for amicus curiae State of Oregon. Also represented by BENJAMIN N. GUTMAN, ELLEN F. ROSENBLUM.

ROBERT T. ANDERSON, University of Washington School of Law, for amici curiae Robert T. Anderson, Reed D. Benson, Michael C. Blumm, Barbara Cosens, Sarah Krakoff, John D. Leshy, Monte Mills, Joseph William Singer, A. Dan Tarlock, Charles F. Wilkinson, Jeanette Wolfley. Amici curiae Michael C. Blumm, John D. Leshy, also represented by DAVID R. OWEN, Hastings College of Law, University of California, San Francisco, CA,

DAVID R. OWEN, Hastings College of Law, University of California, San Francisco, CA, for amici curiae Robert Abrams, Craig Anthony Arnold, Karrigan Bork, Lee P. Breckenridge, Michelle Bryan, Robin K. Craig, Daniel A. Farber, Richard M. Frank, Eric Freyfogle, Robert L. Glicksman, Sean B. Hecht, Oliver A. Houck, Blake Hudson, Christine A. Klein, Rhett Larson, Timothy M. Mulvaney, David R. Owen, Patrick Parenteau, Justin Pidot, Antonio Rossmann, J.B. Ruhl, Erin Ryan, Mark Squillace, David Takacs, Gerald Torres, Sandra Zellmer, Michael Pappas.

SUSAN Y. NOE, Native American Rights Fund, Boulder, CO, for amicus curiae Klamath Tribes.

THOMAS PAUL SCHLOSSER, Morisset Schlosser Jozwiak & Somerville, Seattle, WA, for amicus curiae Hoopa Valley Tribe. Also represented by THANE D. SOMERVILLE.

JOHN ECHEVERRIA, Vermont Law School, South Royalton, VT, for amicus curiae Natural Resources Defense Council.

AMY CHRISTINE CORDALIS, Yurok Tribe, Klamath, CA, for amicus curiae Yurok Tribe.

_____

Before NEWMAN, SCHALL, and CHEN, *Circuit Judges*.

SCHALL, *Circuit Judge*.

### INTRODUCTION AND DECISION

This case arises out of the Klamath River Basin reclamation project ("the Klamath Project" or "the Project"). The Project straddles the southern Oregon and northern California borders. Key features of the Project are Upper Klamath Lake in Oregon, where water is stored for the Project, and the Klamath River. The Klamath River rises at the south end of Upper Klamath Lake and flows from Oregon into California. The river eventually enters the Pacific Ocean near Klamath, California. The Project supplies water to hundreds of farms, comprising approximately 200,000 acres of agricultural land. The Project is managed and operated by the United States Department of the Interior's Bureau of Reclamation ("the Bureau of Reclamation" or "the Bureau"). The Bureau of Reclamation also manages the Klamath Project to protect the tribal trust resources of several Native American Tribes.

In 2001, the Bureau temporarily halted water deliveries to farmers and irrigation districts served by the Project. It took this action in order to meet the requirements of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* (2000) ("the ESA"), as outlined in Biological Opinions from the United States Fish and Wildlife Service ("the FWS") and the United States National Marine Fisheries Service ("the NMFS"). It also took this action in order to meet its tribal trust obligations.

In October of 2001, fourteen irrigation organizations and thirteen individual farmers filed suit in the United States Court of Federal Claims in *Klamath Irrigation District v. United States*, No. 1:01-cv-00591. In their second amended complaint, filed on January 31, 2005, the plaintiffs alleged that the Bureau of Reclamation's action in temporarily halting their water deliveries in 2001 constituted a taking of their water rights without just compensation, in violation of the Fifth Amendment to the United States Constitution. They also alleged that the Bureau's action impaired their water rights under the Klamath River Basin Compact ("the Klamath Compact" or "the Compact").[1] The plaintiffs further alleged that the Bureau's action breached certain water delivery contracts they had

---

[1]   The Klamath Compact is a congressionally-approved interstate compact between California and Oregon. *See* 71 Stat. 497–508 (1957). The Compact's purposes are to "facilitate and promote the orderly, integrated, and comprehensive development, use, conservation, and control [of the water resources of the Klamath River Basin] for various purposes" and to "further intergovernmental cooperation and comity with respect to these resources and programs for their use and development and to remove causes of present and future controversies." *Id.* at 497. Section XIII of the Compact states that "[t]he United States shall not, without payment of just compensation, impair any rights to the use of water for [domestic or irrigation purposes] within the Upper Klamath River Basin." *Id.* at 507. However, this obligation is limited to rights acquired after the effective date of the Compact. *Id.* With respect to the rights of Native American tribes, Article X of the Compact states: "Nothing in this compact shall be deemed . . . [t]o deprive any individual Indian, tribe, band or community of Indians of any rights, privileges, or immunities afforded under Federal treaty, agreement or statute." *Id.* at 505.

with the Bureau.  The Court of Federal Claims exercised jurisdiction pursuant to 28 U.S.C. § 1491(a)(1).[2]

On August 31, 2005, the Court of Federal Claims granted the government summary judgment on the plaintiffs' taking and Klamath Compact claims.  *See generally Klamath Irrigation Dist. v. United States*, 67 Fed. Cl. 504 (2005).  Thereafter, on March 16, 2007, the court also granted the government summary judgment on the plaintiffs' breach of contract claims.  *See generally Klamath Irrigation Dist. v. United States*, 75 Fed. Cl. 677 (2007).[3] Based upon these two summary judgment decisions, the court entered judgment dismissing the plaintiffs' taking claims, their claims arising under the Compact, and their breach of contract claims.  The plaintiffs appealed to this court.

On July 16, 2008, we issued an order in which we certified three questions to the Oregon Supreme Court.  The questions related to the plaintiffs' water rights under Oregon law.  *See Klamath Irrigation Dist. v. United States*, 532 F.3d 1376 (Fed. Cir. 2008) ("*Certification Order*").  We issued the *Certification Order* pursuant to a procedure

---

[2]    On February 28, 2005, the Court of Federal Claims granted the motion of the Pacific Coast Federation of Fishermen's Associations ("the Federation") to intervene as a defendant.  *Klamath Irrigation Dist. v. United States*, 64 Fed. Cl. 328, 331 (2005).  The Federation represents approximately 3,000 small commercial fishing operators who derive income from Pacific salmon that spawn in the Klamath River Basin.  *Id.*

[3]    The Federation joined the government's motion for summary judgment on the breach of contract claims.  Notice of Intervenor-Def. Pac. Coast Fed'n of Fishermen's Ass'ns' Joinder in Federal Defs.' Mot. for Summ. J. on Contract Claims, No. 1:01-cv-00591 (Ct. Fed. Claims Feb. 17, 2006), ECF No. 263.

whereby unsettled questions of state law may be certified to the Oregon Supreme Court. *Id.* at 1377; *see* Or. Rev. Stat. §§ 28.200–28.255 (2007). Pending action by the Oregon Supreme Court, we withheld decision on all of the plaintiffs' claims. The Oregon Supreme Court accepted the case for certification, *Klamath Irrigation Dist. v. United States*, 202 P.3d 159, 165 (Or. 2009), and on March 11, 2010, the court rendered its decision answering our certified questions. *See Klamath Irrigation Dist. v. United States*, 227 P.3d 1145 (Or. 2010) (en banc) ("*Certification Decision*"). Following receipt of the *Certification Decision*, we vacated the judgment of the Court of Federal Claims and remanded the case to the court for further proceedings. *See Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 522 (Fed. Cir. 2011) ("*Remand Decision*").

Following our decision and remand, the Court of Federal Claims entered several orders relevant to the *Klamath Irrigation District* case. It also entered several orders relevant to a related case filed by individual water user plaintiffs, *John Anderson Farms, et al. v. United States*, No. 1:07-cv-00194. First, in an order dated November 22, 2013, the court dismissed the breach of contract claims of three of the *Klamath Irrigation District* plaintiffs for lack of jurisdiction. *Klamath Irrigation Dist. v. United States*, 113 Fed. Cl. 688, 718 (2013). Thereafter, on June 3, 2014, the court granted the remaining *Klamath Irrigation District* plaintiffs' motion to voluntarily dismiss all their pending breach of contract claims. No. 1:01-cv-00591, ECF No. 343. Similarly, on March 13, 2014, the court granted a motion by the plaintiffs in *John Anderson Farms* to voluntarily dismiss their breach of contract claims. No. 1:07-cv-00194, ECF No. 65. Next, on January 12, 2016, the court issued an order consolidating the *Klamath Irrigation District* and *John Anderson Farms* cases. Subsequently, the parties filed cross-motions *in limine* on the question of whether the plaintiffs' taking claims should be analyzed as potential physical or regulatory takings. The plaintiffs urged a

physical takings approach. On December 21, 2016, the court issued an opinion ruling in favor of the plaintiffs. *Klamath Irrigation Dist. v. United States*, 129 Fed. Cl. 722 (2016). In its opinion, the court held that "the government's actions in the present cases 'should be analyzed under the physical takings rubric.'" *Id.* at 737 (quoting *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1296 (Fed. Cir. 2008)). The court's rulings left for trial the plaintiffs' claims that the Bureau of Reclamation's action in 2001 constituted a taking and/or a violation of the Klamath Compact.

Finally, at a pretrial conference on January 10, 2017, the court granted a motion for class certification. The certified class included, as opt-in plaintiffs, all persons who owned or leased land within, or who received water from, the fourteen plaintiff irrigation organizations and who claimed an appurtenant right to Project water[4] and alleged a Fifth Amendment taking and an impairment of their rights under the Compact.

The Court of Federal Claims held a ten-day trial commencing on January 30, 2017. Following the trial and post-trial briefing, all the irrigation organization plaintiffs moved to voluntarily dismiss their claims. The court granted the motion, which left as plaintiffs the surviving individual farmers and the class action opt-in plaintiffs. This resulted in the recaptioning of the consolidated case to *Lonny Baley, et al. v. United States*. Thereafter, on September 29, 2017, the court issued its final decision in the case. *Baley v. United States*, 134 Fed. Cl. 619 (2017)

---

[4] In the context of real property, something is "appurtenant" to land "when it is by right used with the land for its benefit." Appurtenant, Black's Law Dictionary (6th ed. 1990); *see also* Appurtenant, Black's Law Dictionary (11th ed. 2019) (defining appurtenant as "[a]nnexed to a more important thing").

("*Baley*"). In its decision, before addressing the plaintiffs'
taking and Compact claims, the court made several rul-
ings. Three of those rulings disposed of the claims of vari-
ous plaintiffs. First, the court dismissed the claims of any
plaintiffs deriving water rights from the Van Brimmer
Ditch Company. *Id.* at 645–52.[5] Second, the court barred
the claims of certain of the plaintiffs who receive water un-
der what are called "Warren Act Contracts." *Id.* at 656–

---

[5] The Van Brimmer Ditch Company is not an irriga-
tion district, but an Oregon business corporation that de-
livers irrigation water to landowners. *Baley*, 134 Fed. Cl.
at 632. The company traces its history to the 1880s, when
its founders began drawing water from White Lake. *Id.*
White Lake was associated with Lower Klamath Lake,
which is along the border between Oregon and California.
*See id.* The subsequent creation of the Klamath Project re-
sulted in the draining of White Lake and Lower Klamath
Lake (which is now a National Wildlife Refuge). *Id.*; *see
also* U.S. DEP'T OF THE INTERIOR, Ground-Water Hydrology
of the Upper Klamath Basin, Oregon and California at 1–
2, 6 (2010), https://pubs.usgs.gov/sir/2007/5050/. On No-
vember 6, 1909, the Van Brimmer Ditch Company con-
tracted with the United States to receive water from Upper
Klamath Lake. *Baley*, 134 Fed. Cl. at 632. In its contract,
the Van Brimmer Ditch Company agreed to "waive[] and
renounce[] . . . any and all of its riparian rights, in relation
to the waters and shores of Lower Klamath Lake." *Id.* In
exchange, the United States agreed to "deliver to the Com-
pany during each and every irrigation season . . . a quan-
tity of water, not to exceed fifty second feet." *Id.* Named
plaintiffs James and Cheryl Moore are landowner-share-
holders in the Van Brimmer Ditch Company. In 2001, they
owned 135 shares of stock in the company, each of which
corresponded to one acre of irrigable land, with an appur-
tenant right to receive irrigation water from the company.
*Id.*

59.[6] And third, the court ruled that plaintiffs who receive their water through leases for lands in the National Wildlife Refuges that are located within the Klamath Project were barred from recovering damages from the government based upon the denial of water because of certain provisions in their leases. *Id.* at 659.

The court turned finally to the taking and Compact claims of the remaining plaintiffs. After examining the facts and what it viewed to be the pertinent law, the court held that Klamath Project operations in 2001 did not result in takings or violate the plaintiffs' rights under the Compact because the waters retained in Upper Klamath Lake and the waters in the Klamath River were within the scope of federal reserved water rights for tribal fishing that were

---

[6] These irrigation contracts were made pursuant to the Warren Act of 1911, Pub. L. No. 61-406, 36 Stat. 925 (codified at 43 U.S.C. §§ 523–25 (2012)). *Baley*, 134 Fed. Cl. at 630. They are between the United States on the one hand, and individual water users and irrigation districts on the other. *Id.* The contracts cover lands that were not part of the Klamath Project when it was originally developed and contain language stating that water rights acquired under the contracts are inferior to prior rights reserved for the lands of the Klamath Project. *Id.* The Warren Act contracts also include language immunizing the United States from liability in the event of water shortages, although this language takes two different forms. *Id.* at 631. The contracts with individuals and certain irrigation districts include language limiting the United States' liability for shortages caused by droughts or "other cause." *Id.* at 631–32. Contracts with other irrigation districts do not include the "other cause" language. *Id.* at 631. The Court of Federal Claims held that the claims of plaintiffs whose Warren Act contracts included the "other cause" language were barred. *Id.* at 658–59.

senior in priority to the plaintiffs' water rights.  *Baley*, 134 Fed. Cl. at 659–80.

Following the entry of judgment in favor of the government on October 24, 2017, the plaintiffs timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). For the reasons set forth below, we now affirm the judgment of the Court of Federal Claims.

BACKGROUND

I.  The Klamath Project

 The Reclamation Act of 1902, Pub. L. No. 57-161, 32 Stat. 388 (codified, as amended, at 43 U.S.C. § 371 *et seq*.) ("the Reclamation Act" or "the Act") "laid the groundwork for a vast and ambitious federal program to irrigate the arid lands of the western states." *Grant Cty. Black Sands Irrigation Dist. v. U.S. Bureau of Reclamation*, 579 F.3d 1345, 1351 (Fed. Cir. 2009).[7] Section 8 of the Reclamation Act requires the Secretary of the Interior to comply with state law regarding the appropriation of water for irrigation, to the extent such law is not inconsistent with federal law.  *Baley*, 134 Fed. Cl. at 626 (citing 43 U.S.C. § 383).

Relevant to this case, both Oregon and California follow the doctrine of prior appropriation of water rights.  *See Baley*, 134 Fed. Cl. at 669 (citing *Irwin v. Phillips*, 5 Cal. 140, 143 (1855) (California); *Teel Irrigation Dist. v. Water Res. Dep't of Or.*, 919 P.2d 1172, 1174 (Or. 1996) (Oregon)). Under the prior appropriation doctrine, "diversion and application of water to a beneficial use constitute an appropriation, and entitle the appropriator to a continuing right to use the water, to the extent of the appropriation, but not

---

[7]    Prior to passage of the Reclamation Act, at least part of the Klamath Basin was not arid land, but wetlands or marshes that were subsequently drained and converted to farmland pursuant to the Klamath Project.

beyond that reasonably required and actually used. The appropriator first in time is prior in right over others upon the same stream." *Arizona v. California*, 298 U.S. 558, 565–66 (1936). "[T]he doctrine provides that rights to water for irrigation are perfected and enforced in order of seniority, starting with the first person to divert water from a natural stream and apply it to a beneficial use (or to begin such a project, if diligently completed)." *Montana v. Wyoming*, 563 U.S. 368, 375–76 (2011) (citing *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 98 (1938); *Arizona v. California*, 298 U.S. at 565–66; Wyo. Const., Art. 8, § 3). "Once such a water right is perfected, it is senior to any later appropriators' rights and may be fulfilled entirely before those junior appropriators get any water at all." *Id.* at 376.

Subsequent to the passage of the Reclamation Act, on February 22, 1905, the Oregon legislature enacted a statute ("1905 Oregon Act") codifying a procedure to assist the United States in appropriating water for the irrigation works contemplated by the Act. *Remand Decision*, 635 F.3d at 508 (citing Or. Gen. Laws, 1905, ch. 228, § 2 (repealed 1953) and Or. Gen. Laws, 1905, ch. 5, §§ 1–2); *Baley*, 134 Fed. Cl. at 626. Under that procedure, once an officer of the United States filed in the office of the State Engineer a written notice that the United States intended to use certain previously unappropriated waters, the waters were "deemed to have been appropriated by the United States," provided certain deadlines for the filing of plans and construction were met. *Baley*, 134 Fed. Cl. at 626 (quoting Or. Gen. Laws, 1905, ch. 228, § 2). In authorizing the United States to appropriate water for the construction of the Klamath Project irrigation works, "the Oregon legislature authorized the United States to appropriate state water rights pursuant to the 1905 [Oregon A]ct for the benefit of those persons who the Reclamation Act contemplated would put water to beneficial use." *Certification Decision*,

227 P.3d at 1159; *see also Remand Decision*, 635 F.3d at 518 n.8.

On May 17, 1905, the United States Reclamation Service, the predecessor to the Bureau of Reclamation, filed a notice with the Oregon State Engineer. The notice set forth plans for proposed works and proof of authorization for the Klamath Project, as required by the 1905 Oregon Act. *Baley*, 134 Fed. Cl. at 626. The notice stated that "the United States intends to utilize . . . [a]ll of the waters of the Klamath Basin in Oregon, constituting the entire drainage basins of the Klamath River and Lost River, and all of the lakes, streams and rivers supplying water thereto or receiving water therefrom" for purposes of "the operation of works for the utilization of water . . . under the provisions of the . . . Reclamation Act." *Id.*[8]

Under the Klamath Project, water is stored in Upper Klamath Lake by means of the Link River Dam. Water is diverted from Upper Klamath Lake and locations downstream from the lake on the Klamath River and conveyed through canals and laterals to individual users in Oregon and California. *Id.* As part of this process, water is stored and its flow is controlled using a series of dams downstream from the Link River Dam, which is at the south end of Upper Klamath Lake. The last of these dams on the Klamath River is the Iron Gate Dam in California. The works that divert water were constructed by the United States between 1906 and 1966 and are currently owned by the

---

[8]    Private landowners and irrigation companies had begun to divert water for irrigation purposes prior to the development of the Klamath Project; most of those interests were integrated into the Klamath Project. *Baley*, 134 Fed. Cl. at 626.

United States. *Id.*[9] A map of the Klamath River Basin in Oregon and California is provided in the Appendix.

Individual plaintiff landowners (or their lessees) have applied water diverted from the Klamath River to irrigate crops. *Baley*, 134 Fed. Cl. at 626. In this manner, they have put Klamath Project water to beneficial use. As a result, the water became appurtenant to their land. *See Certification Decision*, 227 P.3d at 1163, 1169; *Remand Decision*, 635 F.3d at 518. The United States "holds the water right that it appropriated pursuant to the 1905 Oregon [A]ct for the use and benefit of the landowners." *Certification Decision*, 227 P.3d at 1163–64; *see Remand Decision*, 635 F.3d at 518.

In 1975, Oregon began a general adjudication for the purpose of determining surface water rights in the Klamath River Drainage Basin ("the Klamath Adjudication" or "the Adjudication").[10] *Baley*, 134 Fed. Cl. at 635. The Adjudication was undertaken pursuant to the Oregon Water Rights Act of 1909, Or. Rev. Stat. §§ 539.005–539.240. *See id.* The Adjudication covers pre-1909 state-based water

---

[9] The operation and maintenance of all the federally-owned works downstream of the headgates of Upper Klamath Lake and the operation and maintenance of works that divert water directly from the Klamath River have been transferred by contract to the Klamath Irrigation District and Tulelake Irrigation District, which distribute water to irrigators. *Baley*, 134 Fed. Cl. at 626–27. Similarly, other irrigation districts and individuals have constructed, and own, their own diversion and delivery facilities pursuant to contracts with the United States. *Id.*

[10] An adjudication is a process through which water rights can be quantified; i.e., quantities of water can be allocated to holders of rights in a water source. *See generally* A. Tarlock & J. Robison, Law of Water Rights and Resources §§ 1.1, 7.2 (2019).

rights not previously adjudicated, as well as federal reserved water rights. *Id.* Claims were filed beginning in 1990. Administrative hearings were initiated in 2001, and on February 28, 2014, the adjudicator issued amended and corrected versions of previous orders of determination. Those orders are now before Oregon state courts for judicial confirmation. *Id.*; *see* Klamath Basin General Stream Adjudication, Corrected Partial Order of Determination (Feb. 28, 2014), https://www.oregon.gov/OWRD/programs/Water Rights/Adjudications/KlamathAdj/KBA_ACFFOD_07017. PDF.

## II.  Tribal Fishing Rights

The Klamath Tribes, the Yurok Tribe, and the Hoopa Valley Tribe of Native Americans (collectively, the "Tribes") each hold rights to take fish from water sources on their reservations. These rights were set aside for them when their reservations were created, as discussed in further detail below. The Tribes' rights are non-consumptive, meaning that the Tribes are "not entitled to withdraw water from the stream for agricultural, industrial, or other consumptive uses." *United States v. Adair*, 723 F.2d 1394, 1411 (9th Cir. 1983). Instead, they hold "the right to prevent other appropriators from depleting the streams['] waters below a protected level in any area where the non-consumptive right applies." *Id.*

The Klamath Tribes, which include the Klamath and Moadoc Tribes and the Yahooskin Band of Snake Indians, constitute a federally-recognized tribe which has hunted, fished, and foraged in the Klamath Basin for over a thousand years. *Id.* at 1397; *see Or. Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 755 (1985). The basis for the Klamath Tribes' fishing rights is an 1864 treaty with the United States, in which the Klamath Tribes "relinquished [their] aboriginal claim to some 12 million acres of land in return for a reservation of approximately 800,000 acres" of land that abutted Upper Klamath Lake and

included several of its tributaries. *Adair*, 723 F.2d at 1397–98. In addition to other rights, the 1864 Treaty guaranteed the Klamath Tribes "the exclusive right of taking fish in the streams and lakes, included in said reservation." Treaty Between the United States of Am. & the Klamath & Moadoc Tribes & Yahooskin Band of Snake Indians, Art. I, Oct. 14, 1864, 16 Stat. 707 ("the Klamath Treaty" or "the 1864 Treaty"). In *Adair*, the Ninth Circuit determined that "one of the 'very purposes' of establishing the Klamath [r]eservation was to secure to the Tribe a continuation of its traditional hunting and fishing lifestyle." 723 F.2d at 1408–09.[11] The Klamath Tribes' water rights "necessarily carry a priority date of time immemorial. The rights were not created by the 1864 Treaty, rather, the treaty confirmed the continued existence of these rights." *Adair*, 723 F.2d at 1414 (collecting cases).

Until 1887, the Klamath Tribes lived on their reservation under the terms of the 1864 Treaty, holding the reservation land in communal ownership. *Adair*, 723 F.2d at 1398. In 1887, Congress passed the General Allotment Act, 24 Stat. 388. Under the General Allotment Act, approximately 25% of the reservation passed from tribal to individual Indian ownership. *Id.* In 1954, Congress passed the Klamath Termination Act, 68 Stat. 718 (codified at 25 U.S.C. §§ 564–564w (1976)) ("the Termination Act"), largely terminating the reservation. *Id.* at 1398, 1411–12. This led a large majority of tribal members to give up their interests in tribal property for cash. *Id.* at 1398. However, § 564m(a) of the Termination Act provides that "[n]othing in sections 564–564w of this title shall abrogate any water

---

[11] The *Adair* court referred to the "Klamath Tribe," as opposed to the Klamath Tribe*s*. The parties do not contend that *Adair* does not apply to all the Klamath Tribes. *See Baley*, 134 Fed. Cl. at 633, 670–72; Appellants' Br. 8, 27, 30, 31; Federation's Br. 23; United States' Br. 22.

rights of the tribe and its members," *id.* at 1412, and § 564m(b) specifies that the Termination Act's provisions will not "abrogate any fishing rights or privileges of the tribe or the members thereof enjoyed under Federal treaty," *Oregon Department of Fish & Wildlife*, 473 U.S. at 761–62. Courts have subsequently held that the Klamath Tribes' hunting, fishing and implied reserved water rights survived passage of the Termination Act. *See, e.g., Adair*, 723 F.2d at 1412; *Mattz v. Superior Court*, 758 P.2d 606, 610 (Cal. 1988); *Kimball v. Callahan*, 590 F.2d 768, 774–75 (9th Cir. 1979); *Kimball v. Callahan*, 493 F.2d 564, 568–69 (9th Cir. 1974).

The United States purchased parts of the former Klamath reservation in 1958 and 1961, in order to establish a migratory bird refuge and in order to provide for part of the Winema National Forest. *Adair*, 723 F.2d at 1398. Thereafter, in 1973, the government condemned most of the remaining tribal land, which essentially extinguished the original reservation. *Id.* The Klamath Tribes were later restored as a federally-recognized tribe under the Klamath Indian Tribe Restoration Act of 1986. Pub. L. No. 99-398, 100 Stat. 849.

The rights of the Yurok and Hoopa Valley Tribes, both located in California, were secured by three presidential Executive Orders, issued in 1855, 1876, and 1891. The rights were confirmed by the 1988 Hoopa-Yurok Settlement Act, 25 U.S.C. § 1300i *et seq*. *See Baley*, 134 Fed. Cl. at 633–34 & n.4. Like the Klamath Tribes, the Yurok and Hoopa Valley Tribes are federally-recognized tribes. Indian Entities Recognized and Eligible To Receive Services From the Bureau of Indian Affairs, 77 Fed. Reg. 47,868, 47,869, 47,870, 47,872. The Hoopa Valley reservation is a nearly twelve-mile square on the Trinity River at its confluence with the Klamath River. *See Karuk Tribe of California v. Ammon*, 209 F.3d 1366, 1370 (Fed. Cir. 2000). The Yurok reservation runs along the Klamath River, one mile on each side, from the Hoopa Valley reservation

downstream to the Pacific Ocean. *See id.*; *Parravano v. Babbitt*, 70 F.3d 539, 542 (9th Cir. 1995). Federal and California state courts have recognized that the right of the Yurok and Hoopa Valley Tribes to take fish from the Klamath River for ceremonial, subsistence, and commercial purposes was reserved when the Hoopa Valley reservation was created. *See Baley*, 134 Fed. Cl. at 634, 671; *United States v. Eberhardt*, 789 F.2d 1354, 1359 (9th Cir. 1986); *People v. McCovey*, 685 P.2d 687, 697 (Cal. 1984). A January 9, 1997 Memorandum by the Department of the Interior's Regional Solicitors for the Pacific Southwest and Pacific Northwest Regions recognized that the Yurok and Hoopa Valley Tribes "hold adjudicated water rights which vested at the latest in 1891 and perhaps as early as 1855." *Baley*, 134 Fed. Cl. at 634.

### III. Events of 2001

As noted, the Klamath Project is subject to the requirements of the ESA. In addition, as we noted in the *Remand Decision*, the Ninth Circuit has declared the rights of Klamath Project water users to be subservient to the requirements of the ESA. *Remand Decision*, 635 F.3d at 508 (citing *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1213 (9th Cir. 2000)). "Pursuant to the ESA, the Bureau has an obligation not to engage in any action that is likely to jeopardize the continued existence of an endangered or threatened species or result in the destruction or adverse modification of the critical habitat of such a species." *Id.* at 509 (citing 16 U.S.C. § 1536(a)(1)). "As a result, the Bureau is required to perform biological assessments to determine the impact of the diversion of Klamath Project water for irrigation purposes upon endangered and threatened species and to adjust water delivery to minimize the impact upon the habitat of such species." *Id.* (citing 16 U.S.C. § 1536(a)(2), (c)(1)).

As the Bureau of Reclamation developed its operating plan for the 2001 water year, forecasts from the Natural

Resources Conservation Service indicated that it would be a "critical dry" year due to drought conditions. *Baley*, 134 Fed. Cl. at 637; *Kandra v. United States*, 145 F. Supp. 2d 1192, 1198 (D. Or. 2001) ("As of April 6, 2001, [the Bureau] determined that inflow volume into [Upper Klamath Lake] would be 108,000 acre feet during the period of April through September, the smallest amount of inflow on record."). In response, the Bureau performed biological assessments of the Klamath Project's operations on three species of fish that inhabit associated waters: the endangered shortnose sucker; the endangered Lost River sucker;[12] and the threatened Southern Oregon Northern California Coast ("SONCC") coho salmon.[13]   *Baley*, 134

---

[12]   The shortnose and Lost River suckers were listed as endangered in 1988. *Baley*, 134 Fed. Cl. at 636 (citing Final Rule, Determination of Endangered Status for Shortnose Sucker and Lost River Sucker, 53 Fed. Reg. 27,130 (July 18, 1988)). The Lost River and shortnose suckers' only habitat is Upper Klamath Lake and nearby Project waters. *Baley*, 134 Fed. Cl. at 636; *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 138 F. Supp. 2d 1228 (N.D. Cal. 2001).

[13]   The SONCC coho salmon was listed as threatened in 1997. *Baley*, 134 Fed. Cl. at 636 (citing Final Rule, Threatened Status for Southern Oregon/Northern California Coast Evolutionary Significant Unit (ESU) of Coho Salmon, 62 Fed. Reg. 24,588 (May 6, 1997)). SONCC coho salmon are anadromous fish, meaning they "hatch in fresh water, migrate to the ocean where they are reared and reach mature size, and eventually complete their life cycle by returning to the fresh-water place of their origin to spawn." *Baley*, 134 Fed. Cl. at 634 n.5 (quoting *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 662 (1979), *modified sub nom. Washington v. United States*, 444 U.S. 816 (1979)). The Klamath River downstream of the Iron Gate Dam in California has

Fed. Cl. at 637 (citing *Klamath Irrigation Dist.*, 67 Fed. Cl. at 513).

On January 22, 2001, the Bureau of Reclamation forwarded its biological assessment regarding the SONCC coho salmon to the NMFS, which has jurisdiction over marine and anadromous species. *See id.* On February 13, 2001, the Bureau also forwarded its biological assessment regarding the shortnose and Lost River suckers to the FWS, which has jurisdiction over terrestrial and freshwater species. *See id.* The Bureau requested a formal consultation with both the NMFS and FWS pursuant to § 7(a)(2) of the ESA. Also, it notified the irrigation districts they should not divert or use Project water until the consultations were complete. *Id.* at 637–38.[14] On April 5, 2001, the FWS issued a final Biological Opinion ("FWS Biological Opinion"), concluding that the Bureau's proposed 2001 operating plan was "likely to jeopardize the continued existence of the [Lost River and shortnose] suckers and adversely modify their proposed critical habitat." *See id.*

---

been designated a "critical habitat" for the SONCC coho salmon. *Pac. Coast Fed'n of Fishermen's Ass'ns*, 138 F. Supp. 2d at 1232 (quoting 64 Fed. Reg. 24,049, 24,062 (May 5, 1999)).

[14] Notably, during this time period, the Federation was involved in litigation with the Bureau in the Northern District of California. Specifically, the Federation brought a suit alleging, *inter alia*, that the Bureau had violated the ESA by failing to consult with the NMFS concerning the impact of the Klamath Project's 2000 Operations Plan. *Pac. Coast Fed'n of Fishermen's Ass'ns*, 138 F. Supp. 2d at 1240. The court in that case issued an injunction on April 3, 2001, restricting the Bureau from delivering Project water when Klamath River flows at the Iron Gate Dam dropped below certain minimum levels, until the Bureau complied with ESA consultation requirements. *Id.* at 1251.

at 638 (quoting FWS Biological Opinion, J.A. 2673). The next day, the NMFS issued its final Biological Opinion ("NMFS Biological Opinion"), concluding similarly that the Project's 2001 operating plan was "likely to jeopardize the continued existence of SONCC coho salmon" and "to adversely modify critical habitat for the SONCC coho salmon." *Id.* (quoting NMFS Biological Opinion, J.A. 2995).

As required by the ESA, 16 U.S.C. § 1536(b)(3)(A), the FWS and NMFS Biological Opinions each included "reasonable and prudent alternatives" to address the threat to the fish. The FWS Biological Opinion proposed, among other actions, that the Bureau "not divert water from UKL [Upper Klamath Lake] for irrigation purposes if surface elevations are anticipated to go below [certain minimum levels], regardless of inflow year type." *Baley*, 134 Fed. Cl. at 638 (alterations in original); J.A. 2919. The NMFS Biological Opinion's reasonable and prudent alternative was to operate the Project in a manner that provided certain levels of minimum water releases from the Iron Gate Dam into the Klamath River between April and September of 2001. *Baley*, 134 Fed. Cl. at 638; J.A. 2998–99.

On April 6, 2001, the Bureau issued a Revised 2001 Operations Plan for the Klamath Project ("the Plan"). The Plan incorporated the reasonable and prudent alternatives set forth in the Biological Opinions. The Plan stated that, "[d]ue to the requirements of the biological opinions and the ESA [Endangered Species Act] and the current drought conditions, only limited deliveries of Project water will be made for irrigation." *Baley*, 134 Fed. Cl. at 639 (second alteration in original); J.A. 3177. The Plan also stated:

> The United States has a trust responsibility to protect rights reserved by or for federally recognized Indian tribes by treaties, statutes and executive orders. Reclamation must operate the Project

consistent with its trust obligations to the tribes in
the Klamath River Basin . . . .

. . .

<u>Trust Responsibility of the United States to Feder-
ally Recognized Tribes Within the Klamath River
Basin</u> The trust responsibility to the Klamath Ba-
sin Tribes is shared by all federal agencies that un-
dertake activities in the Klamath Basin.  Fishery
and other resources in the Klamath River, Upper
Klamath Lake . . . , and nearby lakes and streams
are important tribal trust resources to the Klamath
Basin tribes.  Reclamation's Plan provides flow re-
gimes and lake levels for protection of tribal trust
resources within the limitations of the available
water supply.

. . .

Prior to listing of endangered and threatened spe-
cies and the increased scientific understanding of
the needs of ESA-listed species and tribal trust re-
sources, the Project was operated to optimize irri-
gation diversions . . . .

. . .

. . . Under the current hydrology, the [Upper Kla-
math Lake] levels and river flows under this Plan
are consistent with requirements of the ESA and
Reclamation's obligation to protect Tribal trust re-
sources.

J.A. 3176–78.  As a result, the Bureau ceased water deliv-
eries from the Project until July 2001, when it released ap-
proximately 70,000 acre-feet of water.  *Baley*, 134 Fed. Cl.

at 640.[15]    The plaintiffs' suits in the Court of Federal Claims followed.

IV.  Prior Proceedings in the Federal Circuit

As indicated above, after the Court of Federal Claims initially entered judgment against the plaintiffs and dismissed their taking, Compact, and breach of contract claims, the plaintiffs appealed to this court.  Thereafter, as noted, in the *Certification Order*, we certified three questions of law to the Supreme Court of Oregon.[16]  The Oregon

----

[15]    On April 9, 2001, a group of Klamath Project water users filed a lawsuit in the United States District Court for the District of Oregon seeking to enjoin the Bureau from implementing the Plan.  *Baley*, 134 Fed. Cl. at 640; *see Kandra*, 145 F. Supp. 2d at 1195–96, 1199.  The *Kandra* plaintiffs alleged breach of contractual rights to irrigation water, as well as violations of the ESA due to issues in the Biological Opinions.  *See Kandra*, 145 F. Supp. 2d at 1201–02, 1206–11.  The district court denied a preliminary injunction, and the case was ultimately dismissed.  *Id.* at 1211; *Baley*, 134 Fed. Cl. at 640.

[16]    The certified questions were:

1.    Assuming that Klamath Basin water for the Klamath Reclamation Project "may be deemed to have been appropriated by the United States" pursuant to Oregon General Laws, Chapter 228, § 2 (1905), does that statute preclude irrigation districts and landowners from acquiring a beneficial or equitable property interest in the water right acquired by the United States?

2.    In light of the [1905 Oregon] statute, do the landowners who receive water from the Klamath Basin Reclamation Project and put the water to beneficial use have a beneficial or equitable property interest appurtenant to their land in the water right acquired by the United States, and do the

court answered those questions in the *Certification Decision*.[17]  Following receipt of the *Certification Decision*, we

---

irrigation districts that receive water from the Klamath Basin Reclamation Project have a beneficial or equitable property interest in the water right acquired by the United States?

    3.   With respect to surface water rights where appropriation was initiated under Oregon law prior to February 24, 1909, and where such rights are not within any previously adjudicated area of the Klamath Basin, does Oregon State law recognize any property interest, whether legal or equitable, in the use of Klamath Basin water that is not subject to adjudication in the Klamath Basin Adjudication?

*Certification Order*, 532 F.3d at 1377–78.

[17]   The Supreme Court of Oregon answered "no" to our first certified question and "yes" to our third certified question. *Certification Decision*, 227 P.3d at 1157, 1166.  The Court's answer to our second certified question was not definitive:

    2.   Under Oregon law, whether plaintiffs acquired an equitable or beneficial property interest in the water right turns on three factors:  whether plaintiffs put the water to beneficial use with the result that it became appurtenant to their land, whether the United States acquired the water right for plaintiffs' use and benefit, and, if it did, whether the contractual agreements between the United States and plaintiffs somehow have altered that relationship.  In this case, the first two factors suggest that plaintiffs acquired a beneficial or equitable property interest in the water right to which the United States claims legal title, but we cannot provide a definitive answer to the court's

vacated the prior decision of the Court of Federal Claims and remanded the case to the court with instructions:

> [W]e remand plaintiffs' takings and Compact claims for (1) determination, based on the *Certification Decision*, on a case-by-case basis, of any outstanding property interest questions; and (2) determination on the merits, on a case-by-case basis, of all surviving takings and Compact claims. On remand, the Court of Federal Claims should proceed as follows:  First, it should determine, for purposes of plaintiffs' takings and Compact claims, whether plaintiffs have asserted cognizable property interests.  In making that determination, the court should direct its attention to the third part of the three-part test set forth by the Oregon Supreme Court in response to our certified question 2.  That is because it is not disputed that, in this case, the first two parts of the three-part test have been met.  Specifically, the parties do not dispute that plaintiffs have put Klamath Project water to beneficial use and that the United States acquired the pertinent water rights for plaintiffs' use and benefit.  As far as the third part of the three-part test is concerned, the court should address whether contractual agreements between plaintiffs and the government have clarified, redefined, or altered the foregoing beneficial relationship so as to deprive plaintiffs of cognizable property interests for purposes of their takings and Compact claims.

*Remand Decision*, 635 F.3d at 519.

---

second question because all the agreements between the parties are not before us.
*Certification Decision*, 227 P.3d at 1169.

V.  Decision of the Court of Federal Claims on Remand

On remand, the Court of Federal Claims held a ten-day trial.  *Baley*, 134 Fed. Cl. at 645.  As noted above, following various pretrial rulings, what remained at issue for trial were the plaintiffs' claims that the Bureau of Reclamation's actions in 2001 constituted a taking and/or a violation of the Klamath Compact.  In its subsequent final decision, the court began by dismissing the claims of plaintiffs whose water rights are derived from the Van Brimmer Ditch Company.  It did so because the court determined that a November 13, 2003 Order of the Court of Federal Claims remained in effect and continued to bar the plaintiffs from "making any claims or seeking any relief in this case based on rights, titles, or interests that are or may be subject to determination in the Adjudication."  *Baley*, 134 Fed. Cl. at 650.  The court determined that the Van Brimmer Ditch Company's claims were based on the same water rights that were at issue in the Klamath Adjudication.  *Id.* at 651.  Accordingly, the court held that plaintiffs whose rights derived from shares in the Van Brimmer Ditch Company were barred from bringing claims to Klamath Project water based on those shares.  *Id.* at 651–52.

The Court of Federal Claims next addressed the claims of plaintiffs who receive water under Warren Act Contracts.  This was in response to our instruction to "address whether contractual agreements between plaintiffs and the government" had "clarified, redefined, or altered" the beneficial relationship such plaintiffs had obtained by putting to beneficial use Klamath Project water "so as to deprive plaintiffs of cognizable property interests for purposes of their takings and Compact claims."  *Baley*, 134 Fed. Cl. at 652 (quoting *Remand Decision*, 635 F.3d at 519).  This instruction was prompted by the third part of the Supreme Court of Oregon's answer to our second certified question noted above.  The Court of Federal Claims held that plaintiffs whose Warren Act contracts include a shortage provision providing that the United States is immune

from liability caused "[o]n account of drought, inaccuracy in distribution or *other cause*" had had their rights altered in such a way that they were barred from seeking compensation for a taking under the Fifth Amendment or for an impairment of their rights under the Klamath Compact. *Baley*, 134 Fed. Cl. at 657–59 (emphasis added).[18]

Turning to plaintiffs who receive water through leases for land in National Wildlife Refuges, the Court of Federal Claims held such plaintiffs were barred from recovering damages. Among other provisions, those plaintiffs' leases state that "the United States . . . shall not be held liable for damages because irrigation water is not available." *Id.* at 659. Because those plaintiffs' rights were subject to this provision and because "[t]he provision contain[ed] no language requiring that water be unavailable due to specific causes," the court concluded that the claims of plaintiffs who leased land in the National Wildlife Refuges were barred. *Id.*

The Court of Federal Claims then addressed the request of the United States and the Federation to reconsider the court's December 21, 2016 ruling that the Bureau of Reclamation's 2001 actions should be analyzed under a physical taking rubric. *Baley*, 134 Fed. Cl. at 660–66. The court rejected the United States' and the Federation's arguments, again concluding that the Bureau's diversion of water should be analyzed as a potential physical taking. *Id.* at 663–66. In addition, expanding upon its December 21, 2016 opinion, the court concluded that the diversion of

---

[18] The court held that plaintiffs whose contracts do not include the "other cause" language hold beneficial rights to receive Klamath water for which they could seek compensation under the Fifth Amendment or the Klamath Compact. *Baley*, 134 Fed. Cl. at 658.

water should be analyzed as a potential *permanent* physical taking.  *Id.* at 668.

Finally, turning to the issue of tribal water rights, the Court of Federal Claims determined those rights to be federal reserved rights.  *Id.* at 669–70 (quoting *Cappaert v. United States*, 426 U.S. 128, 138 (1976) ("[W]hen the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation.")).  The water rights stemming from tribal reservations established by treaties and executive orders are "substantively the same, at least with respect to non-federal interests," the court observed.  *Id.* at 670 (quoting *Parravano*, 70 F.3d at 545).  Reserved rights, the court stated, "represent an exception to the general rule that allocation of water is the province of the states," and "need not be adjudicated only in state courts."  *Id.* (first quoting F. Cohen, Handbook of Federal Indian Law ("Cohen") § 19.01[1] (2012), then quoting *Cappaert*, 426 U.S. at 145).

The Court of Federal Claims stated that the priority date of a tribe's reserved rights is "no later than the date on which a reservation was established."  *Id.* (quoting Cohen § 19.01[1]).  When a treaty recognizes the continued existence of a tribe's water rights, as the 1864 Treaty with the Klamath Tribes did for those tribes, the rights carry a priority date of "time immemorial," the court stated.  *Id.* (quoting *Adair*, 723 F.2d at 1414).  Although the Yurok and Hoopa Valley Tribes' reserved water rights had not previously been assigned a priority date, the Court of Federal Claims determined that the priority date for those rights must be at least 1891, the year of the last executive order creating the Yurok and Hoopa Valley reservations, possibly earlier.  *Id.*  In contrast, the court noted, the United States first posted notice that it was appropriating water for the Klamath Project in 1905, making the plaintiffs' priority

date 1905 at the earliest. *Id.* Thus, the court concluded, the Tribes' reserved rights are senior to those of the plaintiffs. *Id.*

Continuing, the court stated that the Klamath Tribes' non-consumptive rights entitle them to "prevent other appropriators from depleting [Upper Klamath Lake and its tributaries'] waters below levels that would prevent them from 'support[ing] game and fish adequate to the needs of Indian hunters and fishers.'" *Id.* at 671 (quoting *Adair*, 723 F.2d at 1410–11). "The Lost River and short nose suckers are tribal resources of the Klamath Tribes and uncontested evidence presented at trial demonstrated that the fish have played an important role in the Klamath Tribes' history," the court noted. *Id.* "Thus," the court held, "the Klamath Tribes' aboriginal right to take fish entitles them to prevent junior appropriators from withdrawing water from Upper Klamath Lake and its tributaries in amounts that would cause the extinction of the Lost River and short nose suckers." *Id.* (citing *United States v. Anderson*, 591 F. Supp. 1, 5–6 (E.D. Wash. 1982)).

Similarly, the Court of Federal Claims determined that the SONCC coho salmon is a tribal trust resource for the Yurok and Hoopa Valley Tribes, who hold the right to take fish from the Klamath River for "ceremonial, subsistence, and commercial purposes." *Id.* (quoting *United States v. Eberhardt*, 789 F.2d 1354, 1359 (9th Cir. 1986)). Citing *Adair*, the court held that the Yurok and Hoopa Valley Tribes, like the Klamath Tribes, hold a non-consumptive water right that entitles them, at a minimum, to prevent junior appropriators from withdrawing water from the Klamath River in amounts that would cause the endangerment and extinction of the SONCC coho salmon. *Id.* at 672.

Rejecting the plaintiffs' argument that, absent quantification of the Tribes' water rights, the government could not show that all or any portion of the water in Upper Klamath Lake belonged to the Tribes, the court pointed to the

FWS and NMFS Biological Opinions, which set forth minimum elevations in Upper Klamath Lake and minimum flows into the Klamath River needed to avoid jeopardizing the continued existence of the relevant fish. *Id.* at 673–76. The court found the Biological Opinions to be reasoned and credible. *Id.* at 676. Moreover, the court "accept[ed] the conclusions of the FWS Biological Opinion, including that the elevation levels for Upper Klamath Lake . . . were necessary to avoid jeopardizing the continued existence of the Lost River and shortnose suckers." *Id.* Likewise, the court "accept[ed] the conclusions of the NMFS Biological Opinion, including that the release of certain minimum flows of Klamath Project water . . . were necessary to avoid jeopardizing the continued existence of the SONCC coho salmon." *Id.* Next, the court rejected the plaintiffs' argument that the Bureau's actions were intended solely to meet its obligations under the ESA and were not intended to satisfy the Bureau's tribal trust obligations. *Id.* at 677. In doing so, the court agreed with an argument set forth in the amicus brief filed by the Klamath Tribes that the Bureau's motives are not dispositive. *Id.* at 678. The court also rejected the plaintiffs' contention that because the Yurok and Hoopa Valley Tribes did not file a claim in the Klamath Adjudication, they do not hold Oregon water rights, pointing out that those tribes hold reserved rights arising out of federal, not state, law. *Id.* at 679.

Concluding, the Court of Federal Claims noted that plaintiffs had "perfected their water rights under state law" and had "relied upon those rights" and that many plaintiffs "were severely and negatively impacted by the [Bureau of Reclamation]'s actions." *Id.* at 679–80. The court nonetheless held that the Bureau's actions did not constitute a taking of the plaintiffs' water rights or a violation of the plaintiffs' rights under the Compact. *Id.* The court stated:

> [B]ecause the Tribes held water rights to Klamath Project water that were senior to those held by all

remaining plaintiff class members, and because the Tribes['] water rights were at least co-extensive to the amount of water that was required by defendant to satisfy its obligations under the [ESA] concerning the Lost River and shortnose suckers and the coho salmon in 2001, plaintiffs had no entitlement to receive any water before the government had satisfied what it determined to be its obligations under the [ESA] and its Tribal Trust responsibilities.

*Id.* The court therefore entered judgment in favor of the government. This appeal followed.[19]

## DISCUSSION

### I. Standard of Review and Legal Framework

We review a judgment of the Court of Federal Claims following a trial "to determine if [it is] incorrect as a matter of law or premised on clearly erroneous factual determinations." *Stockton East Water Dist. v. United States*, 761 F.3d 1344, 1349 (Fed. Cir. 2014) (quoting *Dairyland Power Co-op v. United States*, 645 F.3d 1363, 1368–69 (Fed. Cir. 2011)). "We review the Court of Federal Claims' legal conclusions de novo and its factual findings for clear error." *Meridian Eng'g Co. v. United States*, 885 F.3d 1351, 1354–55 (Fed. Cir. 2018) (citing *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1353 (Fed. Cir. 2006), *aff'd* 552 U.S. 130 (2008)). "A finding may be held clearly erroneous when the appellate court is left with a definite and firm conviction that a mistake has been committed." *Id.* at 1355 (quoting *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (internal quotation marks, ellipsis, and citation omitted)).

---

[19] From this point on, we refer to the remaining plaintiffs as "appellants."

The Fifth Amendment to the United States Constitution proscribes the taking of private property "for public use, without just compensation." U.S. CONST. amend. V, cl. 4. When evaluating whether governmental action constitutes a taking, a court employs a two-part test. First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking. Second, if the court concludes that a cognizable property interest exists, it determines whether the government's action amounted to a compensable taking of that property interest. *See Alimanestianu v. United States*, 888 F.3d 1374, 1380 (Fed. Cir. 2018); *Aviation & General Ins. Co. v. United States*, 882 F.3d 1088, 1096 (Fed. Cir. 2018).

## II. Overall Contentions of the Parties

On appeal, appellants argue that the Court of Federal Claims erred in holding that their taking claims were barred by the prior reserved water rights of the Tribes.[20]

---

[20] In addition to requesting that we vacate and remand the case for a determination and award of taking damages, appellants request, in a single sentence in their opening brief, that we award them damages for breach of the Klamath Compact. Appellants' Br. 60; *see also* Reply Br. 13 (alleging that, under the Compact, irrigation rights take priority over water rights for fish and wildlife). The Court of Federal Claims did not provide analysis regarding appellants' rights under the Compact separate from its analysis of their Fifth Amendment claims. *See e.g., Baley*, 134 Fed. Cl. at 652–53, 680. In any event, appellants' cursory mention of the Klamath Compact is insufficient to preserve any separate arguments pertaining to the Compact. *See Trading Techs. Int'l, Inc. v. IBG, LLC*, 921 F.3d 1378, 1385 (Fed. Cir. 2019) ("[A] conclusory assertion with no analysis is insufficient to preserve the issue for appeal."); *United States v. Great Am. Ins. Co. of N.Y.*, 738 F.3d 1320,

Appellants also challenge the court's determinations that appellants who receive water under National Wildlife Refuge leases and that appellants who receive water under Warren Act contracts that limit the government's liability for "other cause" are barred from seeking compensation. Appellants' Br. 43–55. In addition, appellants challenge the court's dismissal of the claims of farmers whose water rights are derived from the Van Brimmer Ditch Company. Appellants' Br. 55–59.[21]

---

1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("[M]ere statements of disagreement with the district court as to the existence of factual disputes do not amount to a developed argument."); *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990) ("[W]e see no reason to abandon the settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). We therefore decline to separately address appellants' rights under the Klamath Compact.

[21] In their opening brief, appellants assert that the water rights deriving from the Van Brimmer Ditch Company date back to 1883, which they claim makes them senior to the "alleged 1891 Hoopa Valley and Yurok tribes' water rights." Appellants' Br. 36. For its part, the government contends that the Yurok and Hoopa Valley Tribes' rights have priority dates of no later than 1855 and 1876, the dates on which their land was reserved. United States' Br. at 32 & n.3. At oral argument, however, appellants' counsel agreed that the Van Brimmer Ditch Company appellants are "in the same situation as everyone else." Oral arg. 17:12–18:22 (July 8, 2019).

The government and the Federation (collectively, "appellees") respond that the Court of Federal Claims did not err in ruling that superior tribal rights defeated appellants' claims. They also contend that the court did not err in its rulings with respect to claims arising from National Wildlife Refuge leases, claims arising from Warren Act contracts containing limiting language, and claims of farmers deriving their water rights from the Van Brimmer Ditch Company. United States' Br. 52–66. In addition, appellees argue that, should we determine that the Court of Federal Claims erred in its tribal rights ruling, we should vacate the court's decision and remand with the instruction that the court analyze appellants' claims as asserting regulatory, as opposed to physical, takings. Federation Br. 36–53; United States' Br. 70–77.

The parties state, and we agree, that we must affirm the judgment of the Court of Federal Claims if we conclude the court did not err in holding that, in 2001, the superior water rights of the Tribes required that the Bureau temporarily halt deliveries of water to appellants. Oral arg. 16:18–54, 17:10–18:22 (appellants); 37:28–43 (government) (requesting affirmance on two independent bases).[22] Accordingly, it is to the issue of tribal rights that we turn first.

### III. Contentions of the Parties Regarding Tribal Rights

### A.

According to the Court of Federal Claims, the rights of appellants to Klamath Project water constitute cognizable

---

[22] If the Tribes' rights control over appellants' property interests, any taking claims asserted by appellants, as well as appellants' other claims, are with respect to inferior property interests and therefore must fail. *See Winters v. United States*, 207 U.S. 564, 568–70, 576–78 (1908) (holding that a tribe's senior, federally-protected right had priority over irrigators' junior, state-law rights).

property interests for which they may seek compensation. And appellees do not challenge this ruling. As seen, however, the court also ruled that those property interests were inferior to the Tribes' non-consumptive water rights—another property interest. It therefore held that appellants could not establish their taking or Compact claims and entered judgment for the government and the Federation.

Preliminarily, the parties agree that the Klamath Tribes have federally-reserved non-consumptive water rights to support fishing on their former reservation. Appellants' Br. 8; Federation's Br. 10–11; United States' Br. 21–22. The parties also agree that the Klamath Tribes' rights have priority to a date of "time immemorial." Appellants' Br. 8; Federation's Br. 10–11; United States' Br. 21–23. Similarly, the parties do not appear to dispute that the Yurok and Hoopa Valley Tribes hold federally-reserved fishing rights, impliedly created by executive order, that permit them to take anadromous fish from waters adjacent to their reservations. *See* Federation's Br. 12–13; United States' Br. 23–24.[23]

---

[23] In their briefs, appellants suggest that cases from this court lead to the conclusion that Congress did not confer any property rights, including water rights, upon the Yurok and Hoopa Valley tribes. Appellants' Br. 27–28; Reply Br. 15–16. In making this suggestion, appellants rely upon *Karuk Tribe of California v. Ammon*, 209 F.3d 1366. In that case, we held that certain individuals and tribes, including the Yurok Tribe, did not possess vested, compensable property interests in the land of the Hoopa Valley reservation for purposes of the Fifth Amendment. *Id.* at 1370, 1375–76. At oral argument, appellants appear to have conceded the existence of the water rights of the Yurok and Hoopa Valley Tribes and to have focused their argument on the scope of those rights. *See* Oral arg. at 5:40–6:16 ("[T]hey have only so much water as is necessary

B.

Appellants make three main arguments relating to tribal rights. First, they argue that it was error for the Court of Federal Claims to hold that, in 2001, the Tribes held rights to an amount of water that was at least equal to what was needed to satisfy the Bureau of Reclamation's ESA obligations. Appellants' Br. 21. The ESA requires that the Bureau not "jeopardize the continued existence" of endangered and threatened fish. 16 U.S.C. § 1536(a)(2). Appellants contend that the Tribes' water rights only entitled them to a catch that was adequate to support a "reasonable livelihood" or a "moderate living," as stated in *Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. at 685, 686. Appellants' Br. 21–23. In other words, appellants argue that the Court of Federal Claims erred by looking to a standard that gave the Tribes more water than they were entitled to.

Continuing with this argument, appellants state that the Klamath Tribes do not fish or use the suckers "for any purpose today." *Id.* at 25. Appellants claim that, under

---

to fulfill the purposes of the reservation [which] were of course to allow for fishing . . . adjacent to the reservation for the Hoopa and Yurok. Those were the original purposes of the reservation.") & 1:15:00—1:16:12 ("Did Congress really intend that [Upper Klamath Lake], 200 miles away, which might supply . . . one percent, two percent, no percent of the flows needed for the salmon runs at the Hoopa, did Congress really intend that that would all come from Klamath Lake and not from anywhere like say, the Trinity River, which has flows of over a million acre-feet per year?"). In any event, to the extent appellants maintain this argument, we do not read *Karuk Tribe* as repudiating the Yurok and Hoopa Valley Tribes' fishing rights. *See Baley*, 134 Fed. Cl. at 634, 671; *Eberhardt*, 789 F.2d at 1359; *McCovey*, 685 P.2d at 697.

*Adair*, the Tribes are entitled to only the amount of water that is sufficient to support their hunting and fishing rights as they currently are exercised. Oral arg. 6:58–10:55; Citation to Supplemental Authority Fed. R. App. P. 28(j) (July 9, 2019). Turning to the Yurok and Hoopa Valley Tribes, appellants state that those tribes catch sufficient fish to sustain their "reasonable livelihood" since they harvest abundant chinook salmon. Appellants' Br. 23–25. In sum, appellants urge that the "reasonable livelihood" or "moderate living" needs of the Tribes did not require that the Bureau halt water deliveries to the extent required to comply with the ESA.

Second, appellants contend that the Court of Federal Claims erred in concluding that the Tribes have senior rights in Klamath Project water. Appellants argue that the Tribes' water rights were created before the Klamath Project and therefore do not include a right to the then nonexistent stored water produced by the Klamath Project. *Id.* at 40–41. According to appellants, in *Oregon Department of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. at 768, the Supreme Court held that the Klamath Tribes' fishing rights extend only to lakes and streams within the tribes' former reservation, which did not include Upper Klamath Lake, where Project water is stored. *Id.* at 26, 31–33. Appellants argue that the Court of Federal Claims misread *Adair* to extend the Klamath Tribes' right to fish to include access to Upper Klamath Lake, since *Adair* dealt only with the Klamath Tribes' fishing rights in the Williamson River, which, along with the Sprague River, flows into Upper Klamath Lake.[24] Appellants maintain there is no evidence

---

[24] In *Adair*, the Ninth Circuit affirmed a decision declaring that the "Klamath Tribe" and its members have water rights, with a priority date of time immemorial, sufficient to maintain their treaty rights to hunt and fish

showing that water in Upper Klamath Lake flows upstream into these rivers. On these grounds, appellants assert that the Klamath Tribes do not have implied rights to the water stored in Upper Klamath Lake for purposes of the Klamath Project.

As far as the Yurok and Hoopa Valley Tribes are concerned, appellants argue that the tribes have waived any rights they have to Klamath Project water because they declined to participate in the Klamath Adjudication. In addition, appellants contend, because the reservations of those tribes lie approximately 200 miles downstream of Upper Klamath Lake, Klamath Project water is not "appurtenant" to their reservations, as required by *Winters v. United States*, 207 U.S. 564 (1908). Appellants' Br. 26–30.

In *Winters*, the United States brought suit to enjoin upstream irrigators from constructing or maintaining dams on the Milk River, or from otherwise preventing the water of the river or its tributaries from flowing downstream to the Fort Belknap Indian Reservation in Montana. 207 U.S. at 565. Although there was no express reservation of the river's water in the 1888 agreement creating the reservation, the Supreme Court noted that it was the "policy" of the government and the "desire of the Indians" to become "a pastoral and civilized people" and that, without the river water to irrigate the land of the reservation, the land would be "practically valueless." *Id.* at 576. Noting that "[b]y a rule of interpretation of agreements and treaties with the Indians, ambiguities occurring will be resolved from the standpoint of the Indians," the Court affirmed the permanent injunction of the district court that prevented the irrigators from interfering with the water flow needed by the reservation. *Id.* at 576–78. The Supreme Court has

---

in the Williamson River watershed on the former Klamath reservation. 723 F.2d at 1397, 1415.

subsequently restated this "Reserved-Water-Rights Doc-
trine" as follows:

> This Court has long held that when the Federal
> Government withdraws its land from the public do-
> main and reserves it for a federal purpose, the Gov-
> ernment, by implication, reserves appurtenant
> water then unappropriated to the extent needed to
> accomplish the purpose of the reservation.

*Cappaert*, 426 U.S. at 138. Cases refer to these reserved
water rights as *Winters* rights. *Crow Creek Sioux Tribe v.
United States*, 900 F.3d 1350, 1352, 1355–56 (Fed. Cir.
2018); *Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144,
1155 (9th Cir. 2017); *see Arizona v. California*, 373 U.S.
546, 600 (1963) ("The Court in *Winters* concluded that the
Government, when it created that Indian Reservation, in-
tended to deal fairly with the Indians by reserving for them
the waters without which their lands would have been use-
less.").

Appellants' argument is that the distance of their re-
spective reservations from Upper Klamath Lake prevents
the Yurok and Hoopa Valley Tribes from claiming *Winters*
rights with respect to Klamath Project water. Any re-
served rights intended for those tribes, appellants contend,
would have been in the closer Lower Klamath Basin or
Trinity River. Appellants' Br. 28–30.

Third, appellants argue that the Court of Federal
Claims erred in several respects regarding the exercise of
the Tribes' rights. Appellants' Br. 33–43. Specifically, ac-
cording to appellants, the Bureau of Reclamation should
not have taken unilateral action in response to the FWS
and NMFS Biological Opinions, but instead should have
sought a "judicial determination regarding the existence,
location, quantity, source, and lawful purposes of the water
rights [at issue], which had not occurred by 2001." *Id.* at
39. In making this argument, appellants cite Section 8 of
the Reclamation Act, which states that the Bureau is to

distribute water "in conformity with [state] laws." *See* 43 U.S.C. § 383. The "state" law to which appellants point is Or. Rev. Stat. § 540.045(4) (2017). In further support of their argument, appellants cite *United States v. Puerto Rico*, 287 F.3d 212 (1st Cir. 2002). Relatedly, appellants contend that the Yurok and Hoopa Valley Tribes waived their water rights because they did not participate in the Klamath Adjudication. Appellants Br. 30. In addition, appellants urge that the water of parties with rights junior to the Klamath farmers and irrigators should have been curtailed first, in reverse order of priority, to satisfy any senior rights of the Tribes. Appellants' Br. 33–36. Finally, relying on *Gros Ventre Tribe v. United States*, 469 F.3d 801 (9th Cir. 2006), appellants argue that the Bureau's compliance with the ESA "discharged any trust responsibility it had to the tribes." Appellants' Br. 41. Appellants assert that "[b]ecause the Government's fiduciary duty attached only to tribal property that it holds in trust, [the Bureau of] Reclamation lacked any authority to withhold Klamath farmers' water in 2001 to satisfy a nonexistent Hoopa/Yurok water right in Klamath Project water, nor an as-yet-undetermined and unquantified Klamath Tribes' water right." *Id.* at 42.[25]

C.

In response to appellants' first argument, appellees contend that the minimum lake and flow levels the Bureau of Reclamation imposed in the Plan were critical to the

---

[25] Appellants also contend that the Court of Federal Claims failed to address the rights of two entities, the Klamath Drainage District and the Klamath Hills District Improvement Company, whom they assert hold state water rights for irrigation independent of the Klamath Project. Appellants' Br. 42–43. Those entities are no longer parties to these proceedings, however. Therefore, this issue is moot.

survival of the relevant fish, and therefore within the Tribes' federal reserved rights. Indeed, appellees argue, avoiding jeopardy under the ESA is a lower threshold than the "reasonable livelihood," or "moderate living," standard for tribal trust resources. Federation's Br. 17–18. Appellees contend that the Klamath Tribes' reserved rights are based on the historical circumstances surrounding the importance of the suckers to the tribes' diets. That the Klamath Tribes no longer harvest suckers is irrelevant, appellees assert, as the tribes' inability to harvest the suckers is because of ESA restrictions and population loss due in part to the Klamath Project. Appellees also contend that, in the Court of Federal Claims, appellants presented no evidence that lower flow levels in the Klamath River would protect the chinook salmon, which are also declining in population, so as to afford the Yurok and Hoopa Valley Tribes a "reasonable livelihood" or "moderate living." United States' Br. 41–42.

Second, appellees respond that the Court of Federal Claims correctly found that the retained waters of Upper Klamath Lake and the Klamath River are within the scope of federal reserved rights of the Tribes. Federation's Br. 8–13; United States' Br. 33, 34–39. According to appellees, the 1864 Klamath Treaty reserved rights in water necessary to fulfill the fishing-related purposes of the Klamath Tribes' reservation, and this reservation of rights extends to water in Upper Klamath Lake. Appellees point to the FWS Biological Opinion as demonstrating that Upper Klamath Lake provides critical habitat for suckers that populate the fisheries on the former Klamath reservation. United States' Br. 36. Similarly, appellees contend, in reserving lands for the purpose of preserving tribal subsistence fishing, the United States reserved sufficient flow of the Klamath River to preserve adequate habitat for salmon for the benefit of the Yurok and Hoopa Valley Tribes. Federation's Br. 12–13; United States' Br. 37–39. Further, once established, the Tribes' rights exist, appellees urge,

even if the Klamath Project was developed at a later point in time.  Federation's Br. 9–10.

Third, appellees contend that the Tribes' federal reserved rights need not be quantified or adjudicated to be enforced.  Federation's Br. 18–20; United States' Br. at 46–49.  This requirement, appellees contend, pertains to state rights, not federal reserved rights.  Appellees argue that state adjudications are limited to waters within a state and cannot encompass water rights to bodies of water that run through other states.  For that reason, appellees claim, the California-based Hoopa Valley and Yurok Tribes could not have waived their federal reserved water rights by failing to participate in Oregon's Klamath Adjudication.  Federation's Br. 21–22; United States' Br. at 48–49.

## IV.  Analysis

As the Court of Federal Claims noted, it is well-established that the creation of a tribal reservation carries an implied right to unappropriated water "to the extent needed to accomplish the purpose of the reservation." *Baley*, 134 Fed. Cl. at 669–70 (quoting *Cappaert*, 426 U.S. at 138); *Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1352, 1356 (Fed. Cir. 2018); *see also United States v. New Mexico*, 438 U.S. 696, 702 (1978) ("Where water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude, even in the face of Congress' express deference to state water law in other areas, that the United States intended to reserve the necessary water.").  Relevant to this case, courts have concluded that the purposes of the Tribes' reservations were to secure to the Tribes a continuation of their traditional hunting and fishing lifestyle.  *Adair*, 723 F.2d at 1408–09 (Klamath); *Parravano*, 70 F.3d at 546 (Yurok and Hoopa Valley).

We are not persuaded by appellants' argument that the Tribes' entitlement to a "reasonable livelihood" or "moderate living" did not require that the Bureau halt water

deliveries to the extent required to comply with the ESA. Beginning with the suckers and the Klamath Tribes, appellants have not argued that the Court of Federal Claims erred when it found that the "Lost River and short nose suckers are tribal resources of the Klamath Tribes and uncontested evidence presented at trial demonstrated that the fish have played an important role in the Klamath Tribes' history." *Baley*, 134 Fed. Cl. at 671. Given that the standard of the ESA is to avoid jeopardizing the existence of the suckers, we do not see how, in this case, the "reasonable livelihood" or "moderate living" standard constitutes a standard lower than the requirement that the very existence of this important tribal resource not be placed in jeopardy.

We also do not agree with appellants that the Klamath Tribes have no rights to the suckers because they do not fish or use the suckers "for any purpose today." That the Tribes do not use endangered species cannot be held against them. In fact, as appellants point out, if the Klamath Tribes' members were to take the endangered suckers, they would be committing a federal offense. Reply Br. 7 & n.23 (quoting 16 U.S.C. § 1538(a)(1)(B)). It does not follow that by not fishing the endangered suckerfish, the Klamath Tribes have abandoned their rights to fish them. *See Navajo Nation*, 876 F.3d at 1155 ("*Winters* rights, unlike water rights gained through prior appropriation, are not lost through non-use.") (citing *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 51 (9th Cir. 1981)).

Similarly, that the Yurok and Hoopa Valley Tribes catch significantly more chinook salmon than SONCC coho salmon does not necessarily mean that they can sustain a "reasonable livelihood" or "moderate living" through the chinook salmon alone.[26] This is particularly true since the

---

[26] The amicus brief of the Hoopa Valley Tribe asserts that "[e]ven the comparatively larger Chinook harvests in

NMFS Biological Opinion indicates that the habitat needs of the chinook and SONCC coho salmon are similar and that "populations of chinook salmon . . . have declined to levels that have warranted their consideration for listing." J.A. 2983. Indeed, the NMFS Biological Opinion also indicates that the Bureau's proposed 2001 operating plan to continue operating the Klamath Project would have reduced the spawning habitat for the chinook salmon. J.A. 2963, 2988, 2995. Moreover, appellants do not dispute the importance of salmon, generally, to the Yurok and Hoopa Valley Tribes.[27] Thus, we do not see how the requirement that these tribes maintain a "reasonable livelihood" or a "moderate living" from the fish can possibly be a lesser

---

2000–2001 cited by Plaintiff-Appellants equate to only 3 to 4 fish annually per member." Amicus Br. of Hoopa Valley Tribe Supporting Defendants-Appellees and Affirmance at 21 n.7.

[27] The Court of Federal Claims cited *Parravano* with respect to the general importance of salmon fisheries to the Yurok and Hoopa Valley tribes. *Baley*, 134 Fed. Cl. at 671. In *Parravano*, the Ninth Circuit determined that the Secretary of Commerce had authority under the Magnuson Fishery Conservation and Management Act, 16 U.S.C. § 1801 *et seq.,* to reduce the ocean harvest rate of chinook salmon by non-tribal commercial fishermen and fishing associations to protect the Yurok and Hoopa Valley Tribes' federally-reserved fishing rights. 70 F.3d at 541, 547. *Parravano* was decided in 1995; the coho salmon was identified as being a threatened species in 1997. The Final Rule listing the SONCC coho salmon as "threatened" indicates that the population of SONCC coho salmon had been in decline for years. *See generally* 62 Fed. Reg. 24,588. According to the Final Rule, "[d]ue to concerns over declining population status, directed harvest of coho salmon has been eliminated since 1994." *Id.* at 24,604.

standard than the requirement that the SONCC coho salmon's very existence not be placed in jeopardy.

It is not necessary for us to determine the amount of fish that would constitute a "reasonable livelihood" or a "moderate living" for the Tribes. At the bare minimum, the Tribes' rights entitle them to the government's compliance with the ESA in order to avoid placing the existence of their important tribal resources in jeopardy. We therefore reject appellants' argument that the Court of Federal Claims erred when it held that the Tribes had rights to an amount of water that was at least equal to what was needed to satisfy the Bureau of Reclamation's ESA obligations.

We turn now to appellants' second main argument noted above: that there are geographic limitations on the Tribes' rights that exclude Upper Klamath Lake, and accordingly Klamath Project water, from the reach of those rights.

The record on appeal is not clear as to whether the Klamath Tribes' fishing rights include the right of tribe members to take fish from Upper Klamath Lake while they stand on former reservation lands. At the same time, appellants are correct that we do not have evidence before us establishing that water from Upper Klamath Lake flows upstream into the Williamson and Sprague rivers. However, there is evidence before us establishing that the Lost River and shortnose suckers *do* travel upstream from Upper Klamath Lake into its tributaries. For example, in *Baley*, the Court of Federal Claims relied upon the Determination of Endangered Status for Shortnose Sucker and Lost River Sucker, which states:

> The present or threatened destruction, modification, or curtailment of its habitat or range. Initial biological surveys of the Klamath Basin indicated the presence of large populations of fishes, and suckers in particular. *Spawning runs of suckers from Upper Klamath Lake were large enough to*

> *provide a major food source for Indians and local settlers.* The shortnose sucker and Lost River sucker were staples in the diet of the Klamath Indians for thousands of years. . . . Even through the 1960's and 1970's, *runs of suckers moving from Upper Klamath Lake up into the Williamson and Sprague Rivers were great enough to provide a major sport fishery that annually attracted many people from throughout the West.* The primary species was the larger Lost River sucker, locally known as mullet, but significant numbers of shortnose suckers also occurred in the runs. During the past years, however, [t]he Klamath Tribe and local biologists have been so alarmed by the population decline of both suckers that in 1987, the Oregon Fish and Wildlife Commission closed the fishery for both species and place[d] them on the State's list of protected species.

53 Fed. Reg. at 27,130 (emphasis added, citations omitted); *see Baley*, 134 Fed. Cl. at 636; FWS Biological Opinion, § III, Part 2, p.44, J.A. 2820 (noting spawning runs of the Lost River suckers in the Williamson and Sprague Rivers).

As noted, the Klamath Tribes have an implied right to water to the extent necessary for them to accomplish hunting, fishing, and gathering on the former reservation, a primary purpose of the Klamath reservation. *See Adair*, 723 F.2d at 1408–09. This entitlement includes the right to prevent appropriators from utilizing water in a way that depletes adjoined water sources below a level that damages the habitat of the fish they have a right to take. *Id.* While the Klamath Project did not exist at the time of the creation of the Klamath Tribes' reservation, Upper Klamath Lake undisputedly did exist at that time, as it was the boundary of the reservation as it was created. *See* Klamath Treaty, Art. I, 16 Stat. 707. The FWS Biological Opinion indicated that maintaining minimum levels in Upper Klamath Lake was "necessary to avoid jeopardy and adverse modification

of proposed critical habitat" for the suckers.  J.A. 2920.  Appellants do not challenge the findings of the FWS Biological Opinion.  Thus, given the facts of record, the Court of Federal Claims did not err in finding that the Klamath Tribes' implied water rights include Upper Klamath Lake.

As seen above, appellants cite *Oregon Department of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. at 768, for the proposition that "[t]he Supreme Court has ruled that the Klamath Tribes' treaty fishing right extends only to lakes and streams within the Tribes' former reservation."  Appellants' Br. 31.  Accordingly, and because the Klamath Project and its additional stored water did not exist in 1864, appellants contend that the Court of Federal Claims "lacked any basis, in law or in fact, to declare a water right for the Tribes in Upper Klamath Lake."  *Id.  Oregon Department of Fish & Wildlife* does not stand for the broad proposition that appellants assert, however.  The case did not involve water rights on the Klamath Tribes' former reservation.  Rather, the question before the Court was whether the tribes retained hunting and fishing rights on land the tribes had ceded to the United States from the reservation under a 1901 agreement.  *See* 473 U.S. at 764.

Even if the Klamath Tribes' *fishing* rights extend only to lakes and streams within their former reservation, this does not mean their reserved *water* right is so limited.  *See John v. United States*, 720 F.3d 1214, 1230 (9th Cir. 2013) ("No court has ever held that the waters on which the United States may exercise its reserved water rights are limited to the water within the borders of a given federal reservation.").  *Winters* itself makes this clear.  207 U.S. at 568, 576–77.  In addition, in *Cappaert*, the United States had reserved Devil's Hole Monument, which included an underground pool that was the only habitat for a type of desert pupfish, for the purpose of preserving the pool.  426 U.S. at 131–32, 141.  The Supreme Court held that the United States could enjoin the pumping of groundwater at a ranch two and a half miles from Devil's Hole.  *Id.* at 133,

147.  In reaching this conclusion, the Court held that the "Reserved-Water-Rights Doctrine" was not limited to surface water and could be extended to groundwater as it is "based on the necessity of water for the purpose of the federal reservation." *Id.* at 142–43.  Likewise, water outside the Klamath Tribes' former reservation is necessary for the purposes of the tribes' reservation—to secure to the Tribes a continuation of their traditional hunting and fishing lifestyles.

Relatedly, we do not agree with appellants that the geography of the Klamath Basin and the distance between Upper Klamath Lake and the Yurok and Hoopa Valley Tribes' reservations mean that Klamath Project water is not subject to those tribes' reserved water rights.  It is true that, downstream from Upper Klamath Lake, between the Iron Gate Dam and the Hoopa Valley reservation (and subsequently, the Yurok reservation) there are other water sources.  Specifically, the Trinity River joins the Klamath River at the Hoopa Valley reservation, and there are several other tributaries to the Klamath River along the way.  However, appellants' focus on the distance between the tribes' reservations, on the one hand, and the Project water in Upper Klamath Lake and Iron Gate Dam, on the other hand, is misplaced.  In *Winters*, the Supreme Court held that the 1888 treaty that established the Fort Belknap reservation had also impliedly reserved water that was being diverted upstream from the reservation.  207 U.S. at 576–77; *see also Cappaert*, 426 U.S. at 133, 147.  Not only does the Klamath River flow from Upper Klamath Lake through the Yurok and Hoopa Valley Tribes' reservations,[28] but the

---

[28]  Although it is difficult to ascertain the position of the Klamath River as it relates to the Hoopa Valley reservation in the pertinent maps in the record, e.g., J.A. 3182, the amicus brief of the Hoopa Valley Tribe asserts that the Klamath River flows through the Hoopa Valley

river's very path defines the borders of the Yurok reservation.  Moreover, as set forth in the NMFS Biological Opinion, the varying water flows at Iron Gate Dam were designed to provide suitable habitat, and adequate water temperatures and quality, to avoid the likelihood of jeopardizing the existence of the SONCC coho salmon.  They also were designed to avoid the destruction or adverse modification of the critical habitat of the coho salmon.  Thus, while the fish may be taken by members of the Yurok and Hoopa Valley Tribes as they stand on their reservations, the habitat of the coho salmon includes waters both downstream from the reservations and also upstream from the reservations to the Iron Gate Dam.  The dam is the stopping point for the salmon's spawning migration because there is no way for the fish to pass through the dam.  J.A. 2109–10, J.A. 2616.  In addition, the dam controls the water of the Klamath River that flows to it from Upper Klamath Lake.  As it is the habitat for the salmon they fish, and as it flows through their reservations, the Yurok and Hoopa Valley Tribes have an implied water right that includes the Klamath River and the flows therein as controlled by the Iron Gate Dam.[29]

---

reservation.  Amicus Br. of Hoopa Valley Tribe Supporting Defendants-Appellees and Affirmance at 1.  Appellants do not state otherwise.

[29]  Appellants argue that "[t]he Court of Federal Claims . . . made no finding to support a conclusion that the amount of water Reclamation released to maintain instream flows was necessary to fulfill the salmon-fishing rights of the Hoopa and Yurok Tribes."  Reply Br. 3.  However, as noted above, the court based its conclusion on the reasoning laid out by the NMFS Biological Opinion, which indicated that a reasonable and prudent alternative was to operate the Project in a manner that provided certain levels of minimum water releases into the Klamath River

We thus conclude that the Court of Federal Claims did not err when it determined that the Tribes' reserved water rights encompass Klamath Project water. We turn now to the question of whether the Tribes' rights were properly exercised.

As noted, appellants contend that it was contrary to Oregon law, specifically, Or. Rev. Stat. § 540.045(4), and thus the Reclamation Act, for Klamath Project water to be "delivered" to anyone other than the Klamath farmers without there first being a final adjudication and quantification. Appellants' Br. 38–40. We disagree.

To begin with, the statute appellants cite simply defines the term "existing water rights of record," as it relates to water to be distributed by a water district's watermaster, to include "all completed permits, certificates, licenses and ground water registration statements filed under [Or. Rev. Stat. § 537.605] and related court decrees." Or. Rev. Stat. § 540.045(1), (4); *see also* Or. Rev. Stat. §§ 540.010 (stating that the state shall be divided into water districts), 540.020 (explaining that each water district shall have an appointed watermaster). We fail to see how this statute relates to the issue of tribal rights that is before us in this case.

More importantly, federal courts have consistently held that tribal water rights arising from federal reservations are federal water rights not governed by state law. *Arizona v. California*, 373 U.S. at 597; *see also Cappaert*, 426 U.S. at 145; *Colville Confederated Tribes v. Walton*, 752 F.2d 397, 400 (9th Cir. 1985).

---

between April and September of 2001 that, in NMFS's judgment, would be "sufficient to avoid jeopardizing the species." J.A. 2997–99. We see no clear error in this factual determination.

As the "volume and scope of particular reserved rights . . . are federal questions," *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813 (1976), there is no need for a state adjudication to occur before federal reserved rights are recognized. *See Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 849 F.3d 1262, 1272 (9th Cir. 2017) ("[S]tate water rights are preempted by federal reserved rights."). Thus, given the facts of record in this case, it was not necessary for the Tribes' rights to have been adjudicated before the Bureau acted.[30]

---

[30] In support of their argument that parties whose water rights are junior to theirs should have been curtailed first, appellants point us to websites for executing water rights queries directed to Oregon's Water Resource Department and to the California State Water Resource Control Board. Appellants' Br. 34 nn.131 & 132. A user selecting the relevant time period for the Klamath Basin watersheds on these websites is presented with lists of over a thousand entities claiming water rights. Given that there are hundreds of plaintiffs in this case, to determine (1) which entities were junior to which appellants, and (2) the basis for those entities' junior status, is beyond the purview of this court, particularly when it is not clear from the record that this information was before the Court of Federal Claims. *See Pullman-Standard v. Swint*, 456 U.S. 273, 291–92 (1982) ("[A] Court of Appeals should not . . . resolve[] in the first instance [a] factual dispute which [was not] considered by the District Court.") (citing *DeMarco v. United States*, 415 U.S. 449, 450 n.* (1974)).

Further, given the ongoing, unfinished status of the Klamath Adjudication in 2001, we see no reason for the Bureau to have curtailed junior users' water before curtailing appellants' water, particularly when it is not evident that

Appellants' reliance on *United States v. Puerto Rico* is misplaced. *Puerto Rico* involved the McCarran Amendment, 43 U.S.C. § 666, a law that waived the sovereign immunity of the United States in suits for the general adjudication or administration of water rights. 287 F.3d at 213. The issue before the court was whether the statute divested the United States of its sovereign immunity so as to compel the United States Navy to participate in administrative proceedings concerning the Commonwealth of Puerto Rico's efforts to impose restrictions on the extraction of water from the Rio Blanco River. *Id.* The court held that the McCarran Amendment did not waive sovereign immunity with respect to the proceedings because the proceedings did not involve a "suit" within the meaning of the McCarran Amendment. *Id.* at 214. In arriving at its decision, the court discussed *United States v. Oregon*, 44 F.3d 758 (9th Cir. 1994), relied upon by Puerto Rico. In that case, the court considered a statutory scheme having both administrative and judicial components. *Oregon*, 44 F.3d at 767. The *Puerto Rico* court found that the Oregon law in that case "construct[ed] a seamless proceeding, possessing both administrative and judicial components. 287 F.3d at 219 (citing *Oregon*, 44 F.3d at 764). Puerto Rico's administrative scheme, the court determined, did not "establish a seamless process with both administrative and judicial components. Rather, it contemplates a purely administrative proceeding." *Id.* We are unable to see how *Puerto Rico* is pertinent to this case.

Nor do we believe that the Yurok and Hoopa Valley Tribes waived their rights because they did not participate in the Klamath Adjudication. For the reasons discussed above, their rights are federal reserved water rights not governed by state law. Moreover, states have the ability to

doing so would have been sufficient to satisfy the Tribes' reserved water rights.

adjudicate rights in a water or river system within their jurisdiction, but they cannot adjudicate water rights in another state. *United States v. Dist. Court for Eagle County, Colo.*, 401 U.S. 520, 523 (1971) ("No suit by any State could possibly encompass all of the water rights in the entire Colorado River which runs through or touches many states. The 'river system' must be read as embracing one within the particular State's jurisdiction."). Thus, the Yurok and Hoopa Valley Tribes' lack of participation in the state of Oregon's Klamath Adjudication did not preclude their entitlement to water that flows in the Klamath River below the Iron Gate Dam in California.

Finally, we are not persuaded by appellants' argument, relying upon *Gros Ventre v. United States,* that the Bureau of Reclamation lacked authority in 2001 to withhold Klamath Project water. In the first place, as noted above, in making this argument, appellants refer to "a nonexistent Hoopa/Yurok water right in Klamath Project water" and "an as-yet-undetermined and unquantified Klamath Tribes' water right." As just seen, however, the Yurok and Hoopa Valley Tribes did in fact have reserved rights in Klamath Project water, while the Klamath Tribes also had reserved rights in Klamath Project water. Furthermore, as we have just demonstrated, none of these rights had to be quantified. Beyond that, appellants' reliance on *Gros Ventre* is misplaced. In that case, the Ninth Circuit determined that the Gros Ventre Tribe, Assiniboine Tribe, and Fort Belknap Indian Community Council did not have a cause of action for breach of the government's tribal trust obligations separate from any cause of action arising from a statutorily granted right. 469 F.3d at 807, 809–14. Here, the Bureau's actions to comply with the ESA and to protect tribal resources were one and the same. Whether the Tribes would have had a separate cause of action against the United States had the Bureau not complied with the ESA is not before us.

In sum, given the facts of this case, the federal reserved rights of the Tribes need not have been adjudicated or quantified before they were asserted to protect the Tribes' fishing rights.

## CONCLUSION

For the foregoing reasons, we agree with the Court of Federal Claims that appellants' water rights were subordinate to the Tribes' federal reserved water rights. We therefore see no error in the court's holding that the Bureau of Reclamation's action in temporarily halting deliveries of Klamath Project water in 2001 did not constitute a taking of appellants' property. Because the parties agree this ruling is dispositive of the case, we need not reach appellants' remaining arguments on appeal noted above.[31]

## **AFFIRMED**

### COSTS

Each party shall bear its own costs.

---

[31] In addition, in view of our disposition of the case, it is not necessary for us to address appellees' argument that the Court of Federal Claims erred in employing a physical, instead of a regulatory, taking analysis. We therefore express no view on the issue.

APPENDIX



U.S. Fish & Wildlife Serv., Map of the Klamath River Basin (2003), *available at* https://www.fws.gov/yreka/Maps/Kla-mathRvBasinV4.jpg.